# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 16-498V
### (Not to be published)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

HEATHER WRIGHT,        \*
*as Mother and Natural Guardian of minor*   \*
*child, B.W.,*                \*
                     \*        Special Master Corcoran
          Petitioner,    \*
                     \*        Filed: January 18, 2019
v.                          \*
                     \*        Six-Month Residual Effects
SECRETARY OF HEALTH AND     \*        Requirement; Immune
HUMAN SERVICES,              \*        Thrombocytopenic Purpura ("ITP");
                     \*        Measles-Mumps-Rubella ("MMR")
          Respondent.    \*        Vaccine.
                     \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Leah V. Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.

*Traci R. Patton*, U.S. Dep't of Justice, Washington, DC, for Respondent.

## ENTITLEMENT DECISION[1]

        Heather Wright, as legal representative of her child, B.W., filed a petition on April 21, 2016, seeking compensation under the National Vaccine Injury Compensation Program ("Vaccine Program").[2] ECF No. 1. Petitioner alleged that the measles-mumps-rubella ("MMR") vaccine B.W. received on March 28, 2014, caused him to develop immune thrombocytopenic purpura ("ITP"). Pet. at 1.

---

[1] Although this Decision has been formally designated "not to be published," it will nevertheless be posted on the Court of Federal Claims' website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means that the Decision will be available to anyone with access to the internet.** As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole decision will be available to the public in its current form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10–37 (2012) (hereinafter "Vaccine Act" or "the Act"). Individual section references hereafter shall refer to § 300aa of the Act.

Although Respondent takes no position on whether B.W. developed ITP within an appropriate time frame after vaccination sufficient to support a "Table claim,"[3] he asserts that B.W. does not satisfy the statutory prerequisite that petitioners establish that their vaccine-related injury or the residual effects thereof lasted for more than six months.[4] Resp't's Mot. to Dismiss & Rule 4(c) Report at 1–2, filed Sept. 21, 2016 (ECF No. 12) ("Rule 4(c) Rep.") (citing Section 11(c)(1)(D)).[5] On these grounds, Respondent moves to dismiss Petitioner's claim. *Id.* at 2.

For the reasons set forth below, I find that Petitioner has failed to satisfy the severity requirement. Accordingly, her claim is **DISMISSED**.

## I.     Factual Background

B.W. was born on March 21, 2012. Ex. 2 at 57, filed July 6, 2016 (ECF No. 6). Before receiving the MMR vaccine, he was in generally good health, though somewhat behind schedule on his vaccinations. *Id.* at 57–61. At his two-year-old well-child visit on March 28, 2014, B.W. received several vaccinations, including MMR. *Id.* at 53–54, 58–60.

Approximately two weeks later, on April 15, 2014, B.W. presented at the emergency room at Ty Cobb Regional Medical Center in Lavonia, Georgia, accompanied by his father and paternal grandmother, with bruises on his forehead, abdomen, and all four extremities. Ex. 3 at 3–4, filed Apr. 22, 2016 (ECF No. 6).[6] Within a matter of hours, lab results revealed that B.W.'s platelet count was only 43,000—far below the normal range of 150,000 to 400,000.[7] *Id.* at 13. He was

---

[3] The Vaccine Injury Table ("Table") lists certain vaccines associated with specific injuries and illnesses. Section 14(a); 42 C.F.R. § 100.3(a) (2017). When a Petitioner demonstrates that she received a covered vaccine and subsequently suffered an associated injury or illness within the time period provided by the Table, she need not show causation-in-fact in order to be entitled to compensation under the Vaccine Act. *Shalala v. Whitecotton*, 514 U.S. 268, 269–70 (1995). ITP following the MMR vaccine (with onset between seven and thirty days post-vaccination) is one such Table claim. 42 C.F.R. § 100.3(a).

[4] Alternatively, a Vaccine Program petitioner may satisfy the statutory prerequisite if she dies as a result of her vaccine injury, or if her injury requires surgical intervention and inpatient care. Section 11(c)(1)(D). Petitioner does not purport to satisfy either alternative, however, and relies solely on the six-month requirement. Pet'r's Br. Supporting Entitlement to Compensation at 7, filed Nov. 30, 2018 (ECF No. 52) ("Pet'r Br.")

[5] Respondent takes no position on whether Petitioner has satisfied the requirements for a Table claim. Rule 4(c) Rep. at 2 n.2. However, he reserves the right to file a supplemental Rule 4(c) Report should I find that the six-month residual effects requirement has been satisfied. *Id.*

[6] B.W.'s bruises were sufficiently severe to raise concerns that they might have been the result of nonaccidental trauma, so treaters contacted law enforcement, who investigated Ms. Wright for possible child abuse. Ex. 4 at 74, filed Apr. 22, 2016 (ECF No. 6). The duration and depth of this investigation are unclear from the record as filed.

[7] Platelet counts reveal "the number of platelets (thrombocytes) per cubic milliliter of blood." *Crabbe v. Sec'y of Health & Human Servs.*, No. 10-762V, 2011 WL 4436724, at *2 n.9 (citing Pagana et al., *Mosby's Manual of Diagnostic and Laboratory Tests* 416 (4th ed. 2010)).

diagnosed with thrombocytopenia[8] and discharged to his father and grandmother's care that same evening. *Id.* at 8.

The following day, B.W. arrived at Children's Hospital of Atlanta ("CHOA") by ambulance. Ex. 4 at 45–46. Notes from this visit reflect some initial treater uncertainty about whether his bruising was the result of nonaccidental trauma or ITP (*see id.* at 74; Ex. 2 at 66), but treaters again ultimately concluded that his low platelet count (68,000 that day) was diagnostic of ITP. Ex. 4 at 91. B.W. was discharged to his mother's care later that evening with a diagnosis of "thrombocytopenia likely secondary to acute ITP." *Id.*

Over the following weeks, B.W. saw various pediatricians at the Longstreet Clinic in Gainesville, Georgia, for frequent blood checks. *See* Ex. 2 at 88, 94, 102, 107, 115, 117. His platelet counts fluctuated significantly over these visits: 180,000 on April 21; 68,000 on May 2; and 111,000 on May 7. *Id.* at 88, 94, 115. However, his bruising, though still visible, did not appear to worsen. *See, e.g.*, *id.* at 90, 107, 113. Following an April 29th visit with pediatrician Garrick Bailey, M.D., B.W. was referred to hematology for more detailed analysis of his blood condition. *Id.* at 101. B.W. saw two hematologists at CHOA, Benjamin Watkins, M.D., and Michael Briones, D.O. *Id.* at 123–28. They concluded that he had ITP resulting from his MMR vaccination, but noted that his thrombocytopenia was "not severe at this time" and recommended follow-up visits "every 1–2 months until resolution." *Id.* at 127.

On July 8, 2014—less than three months after onset of his ITP—B.W. presented to Dr. Bailey for a platelet count at Petitioner's request. Ex. 2 at 142. At that visit, Dr. Bailey noted that B.W.'s ITP had "resolved." *Id.* at 144. B.W. thereafter never returned to a hematologist for official clearance otherwise.[9] Sporadic platelet count checks over the following months never showed platelet counts outside the normal range. *See, e.g.*, *id.* at 136 (platelet count of 312,000 on September 10). These checks were conducted at visits for other complaints in response to concerns about B.W.'s history of ITP. *See, e.g.*, *id.* at 136 (September 10th visit for headache), 155 (January 26, 2015 visit for bruising on shins and abdomen).

Since resolution of his ITP, B.W. has largely remained in good physical health. Petitioner reports that, at age three and a half years, B.W. was diagnosed with attention deficit hyperactive disorder ("ADHD"). Ex. 14 at 4, filed Feb. 21, 2018 (ECF No. 45-1) ("Jordan Rep.").[10] Notes from

---

[8] Decreased platelet count. *Dorland's Illustrated Medical Dictionary* 1922 (32nd ed. 2012).

[9] A follow-up with Drs. Watkins and Briones was scheduled for June 10, 2014. Ex. 2 at 128. However, Ms. Wright stated that she canceled this follow-up visit due to a stomach bug. Ex. 9 at 15, filed July 6, 2016 (ECF No. 9-2). She did not reschedule. *Id.*

[10] While Petitioner informed Dr. Guy Jordan that B.W. had been diagnosed with ADHD and prescribed Adderall at age three and a half (Jordan Rep. at 4), the medical records filed in this case provide no clear support for such a

treaters, both before and after his ADHD diagnosis, consistently characterize B.W. as very active, playful, and happy. *See, e.g.*, Ex. 2 at 92, 121 (notes from April 18, 2014: "[n]o obvious distress, active, happy, appropriate for age;" May 2, 2014: "[n]o obvious distress, interactive, very playful/active"); Ex. 9 at 27 (January 21, 2016: "smiles, playful, and active and alert"). Medical records do not reflect any stated concerns from Ms. Wright about her son's psychological well-being or behavioral development, except for concerns about excessive activity levels. *See, e.g.*, Ex. 2 at 140; Ex. 9 at 11.

## II.     Procedural History

As noted above, Petitioner filed her claim on April 21, 2016. Medical records were filed over the coming months. Then, on September 21, 2016, Respondent filed a combined Rule 4(c) Report and Motion to Dismiss, arguing that Petitioner could not meet the severity requirement under the Vaccine Act, given that B.W.'s ITP had resolved in less than six months from onset. Petitioner responded to the Motion to Dismiss on October 5, 2016, and Respondent filed his Reply on October 28, 2016. The parties filed expert reports from Drs. Shaer and Gill in early 2017.

The case was originally assigned to the Special Processing Unit (as it initially appeared to meet the requirements of a Table claim and was therefore anticipated as likely to settle), but was reassigned to me after Respondent raised the severity issue as a roadblock to the claim. I thereafter inquired of the parties as to whether a hearing would help resolve the issue, and they agreed. To that end, both filed prehearing briefs on September 8, 2017. A one-day hearing took place on September 21, 2017.

At the close of the hearing, I noted to both sides that it was my preliminary conclusion that (based on existing Program case law directly relevant to ITP) Ms. Wright was not going to be able to satisfy the severity requirement simply on the basis of ongoing monitoring of B.W.'s platelet levels after those levels had become normal. Tr. at 99–100; Order at 1, dated Sept. 21, 2017 (ECF No. 38) ("Post-Hr'g Order") ("I reject Petitioner's argument that subsequent monitoring of a resolved condition that has never recurred can satisfy the Act's severity requirement"). However, it was conceivable, based on testimony at the hearing, that an alleged psychological response to B.W.'s treatment could itself satisfy the six-month requirement if the response and accompanying treatment extended beyond that time period. *See* Tr. at 101; Post-Hr'g Order at 1. I therefore asked the parties to submit post-hearing briefs and supporting evidence on the newly-raised issue of whether B.W. may have suffered a psychological or trauma-type sequalae of his injury that would satisfy the six-month requirement. Post-Hr'g Order at 1–2. Petitioner filed a post-hearing brief on December 29, 2017, and Respondent did the same on February 12, 2018. The parties thereafter

---

diagnosis during the stated time period. *See, e.g.*, Ex. 9 at 7, 46, (no current medications listed at May 6, 2016 visit; ADD and ADHD listed as negative in past medical history at April 21, 2016 visit).

filed expert reports from Drs. Jordan and Miller. Respondent submitted his final brief in support of dismissal on September 28, 2018, and Petitioner responded on November 30, 2018.

## III.     Expert Reports and Testimony

Each party offered testimony from one medical expert at the September 21, 2017 hearing: Catherine Shaer, M.D., on behalf of Petitioner, and Joan Gill, M.D., on behalf of Respondent. Each party subsequently solicited a report from an additional expert—Guy Jordan, Ph.D., for Petitioner, and Judith Miller, Ph.D., for Respondent—to address the separate question of whether psychological trauma existed sufficient to satisfy the severity requirement. Neither Ms. Wright nor any other lay witness offered testimony or an affidavit on the severity issue.

### A.   *Dr. Catherine Shaer*

Dr. Catherine Shaer prepared one report for Petitioner and testified at the September 2017 hearing. Her curriculum vitae ("CV") reflects that she received her B.A. from Quinnipiac College in Hamden, Connecticut, and her M.D. from University of Texas Health Science Center in San Antonio. Ex. 12 at 1, filed Feb. 3, 2017 (ECF No. 22-2). She completed a three-year residency in pediatrics at Children's National Medical Center in Washington, D.C. in 1981 and is board-certified in pediatrics. *Id.* She served for many years as the medical director of the spina bifida program at Children's National Medical Center. *Id.* at 3. From 2008 to 2014, Dr. Shaer worked as a medical officer at the Health and Human Services Division of Vaccine Injury Compensation, where she reviewed Vaccine Program claims on behalf of Respondent. *Id.* at 2. For the past four years, she has done similar work for petitioners' attorneys, reviewing potential vaccine claims and offering testimony and reports on behalf of Vaccine Program claimants. *Id.* at 1. She published articles, most often on spina bifida, in several medical journals throughout the late 1980s and 1990s. *Id.* at 7–8.

Dr. Shaer's two-page expert report briefly summarizes the course of B.W.'s ITP and her conclusion that later-in-time blood draws could be directly attributed to his April 2014 ITP diagnosis. *See generally* Ex. 11, filed Feb. 3, 2017 (ECF No. 22-1). Noting that blood draws are not routine pediatric care practice for children older than twenty-four months, she concluded that "but for the fact that [B.W.] developed ITP he would not have had blood drawn to check his platelet count in June and September of 2014 and January and July of 2015." *Id.* at 2.

At hearing, Dr. Shaer testified about B.W.'s clinical course and the duration of his ITP. Drawing both on her experience as a pediatrician and her familiarity with Vaccine Program requirements, she opined that the residual effects of B.W.'s ITP lasted longer than six months. Tr. at 21. She also testified about a phone conversation she had with the Ms. Wright, and offered some

opinions about how Ms. Wright's response to B.W.'s ITP diagnosis might play into his behavioral development. *Id.* at 29–38.

Dr. Shaer discussed the appropriate monitoring of a child who has previously been diagnosed with ITP, such as B.W. She emphasized that visible bruising—as seen on B.W. more than six months after his ITP was initially identified—constitutes a visual manifestation of a low platelet count (and is indicated as such in the Vaccine Injury Table). Tr. at 19. On cross-examination, however, she clarified that bruising alone would not be diagnostic of ITP, and that ITP is exclusively defined by a low platelet count. *Id.* at 44–45. She also conceded that B.W.'s platelet count did not fall to levels constituting thrombocytopenia at any time more than six months after his initial diagnosis, and agreed that notes from treating physicians reflected that his ITP had in fact resolved by July 8, 2014.[11] *Id.* at 54–56, 64.

In addition, Dr. Shaer testified that, pursuant to guidelines from the American Academy of Pediatrics, routine check-ups for children need not include regular platelet counts unless treaters suspect a problem. Tr. at 20. Platelet counts conducted for B.W. after September 28, 2014 (six months after vaccination and claimed onset of his ITP), she testified, constituted "management of his condition." *Id.* at 22. She also noted that, given that B.W.'s ITP did not resolve (as some cases do) within a matter of days, the "appropriate thing" for treating doctors to do was to continue monitoring his platelet counts "until they knew it was normalized." *Id.* at 17–18.

Dr. Shaer also testified, as a sort of hybrid fact-expert witness, about Petitioner's account of B.W.'s ITP diagnosis and treatment. Dr. Shaer summarized a telephone conversation she had with Ms. Wright on September 9, 2015. Tr. at 29–38. According to Ms. Wright, B.W. initially presented with an alarmingly large bruise on his side, which medical professionals feared was due to nonaccidental trauma. *Id.* at 30. An investigation involving police departments from multiple jurisdictions ensued, during which B.W. was separated from his mother. *Id.* at 30–31. Dr. Shaer was unsure how long this period of separation lasted. *Id.* at 30.

Ms. Wright mentioned to Dr. Shaer (in a hearsay statement that Petitioner herself has never corroborated) that B.W.'s behavior changed "after all this happened," and he became "hard to control." Tr. at 32. But Dr. Shaer did not provide further details about B.W.'s changed demeanor. At best, she speculated that any changes in B.W.'s demeanor as a result of his ITP diagnosis might be attributable in part to a form of vulnerable child syndrome. *Id.* at 32–35. Vulnerable child syndrome, Dr. Shaer explained, occurs when a parent responds to her child's health problems with excessive and irrational levels of concern, which can influence the nature of her interactions with the child. *Id.* at 32–33. This in turn can affect the sick child's behavior. *Id.* at 34. Dr. Shaer noted

---

[11] On cross-examination, Dr. Shaer also conceded that she erred in typing some dates in her report. Tr. at 46. While her report states that B.W.'s platelet count was regularly monitored through July 8, 2015, she agreed with Respondent's counsel that the correct date was July 8, *2014*. *Id.* at 47.

that presentation of vulnerable child syndrome varies widely—some children may begin to have temper tantrums, while others may become quiet and withdrawn. *Id.*

In Dr. Shaer's view, the degree of concern Ms. Wright expressed about B.W.'s ITP was excessive, which she posited could affect B.W.'s behavior. Tr. at 32, 38. She noted that Ms. Wright demonstrated ongoing anxiety and fear about B.W.'s condition, and that she appeared to believe her child continued to suffer from ITP, even though he had long been stable at the time of their conversation. *Id.* at 31, 69. When asked whether the tests and examinations B.W. underwent in the days after his bruising was first noted could have been traumatizing for the child, Dr. Shaer again focused on *Ms. Wright's* likely reaction to such procedures, reiterating that excessive concern on her part could in turn affect B.W. *Id.* at 36–38.

Ultimately, Dr. Shaer did not consider a specific diagnosis of vulnerable child syndrome to be particularly important in this case. She stated that "we can even forget that term," emphasizing instead that Ms. Wright's response to B.W.'s diagnosis was of such a nature that she felt B.W. should receive some kind of psychological examination in order to ascertain the full extent of how his mother's reaction to his ITP might be affecting his behavior. *Id.* at 39. On cross-examination, however, she conceded that nothing in B.W.'s medical record showed any signs of behavioral or psychological problems. *Id.* at 58, 66.

### B.  *Dr. Joan Gill*

Dr. Joan Gill prepared one report on Respondent's behalf and testified at hearing. As noted on her CV, she received her B.S. at St. Norbert College in West De Pere, Wisconsin, and her M.D. from the Medical College of Wisconsin in Milwaukee. Ex. C[12] at 1, filed May 23, 2017 (ECF No. 28-4). She completed both a pediatric internship and residency at Milwaukee Children's Hospital, followed by a fellowship in pediatric hematology-oncology at the Medical College of Wisconsin and the Blood Center of Southeastern Wisconsin. *Id.* at 1–2. Dr. Gill is board certified in pediatric hematology/oncology, and she has served as a professor, first of pediatrics and more recently of population health and epidemiology, at the Medical College of Wisconsin since 1981. *Id.* at 2, 4. Her numerous publications on blood disorders have appeared in many medical journals. *Id.* at 11–25.

Dr. Gill's three-page report provides a detailed overview of B.W.'s ITP, which she states "resolved within three months." Ex. B at 1–2, filed May 23, 2017 (ECF No. 28-1). Platelet counts measured after resolution of B.W.'s ITP were often requested by Ms. Wright, according to her review of the medical records, but consistently reflected platelet levels "well within the normal range." *Id.* at 2–3.

---

[12] Before hearing, Respondent filed three documents as Exhibits A, B, and C. After hearing, Respondent submitted three additional pieces of evidence, also filed as Exhibits A, B, and C.

At hearing, Dr. Gill distinguished between acute and chronic ITP, explaining that chronic ITP is characterized by thrombocytopenia lasting longer than one year (formerly six months). Tr. at 78. Dr. Gill noted that almost all vaccine-related ITP cases are acute. *Id.*

Discussing B.W.'s medical records, Dr. Gill agreed with notes from a treating physician indicating that his ITP had resolved by July 8, 2014. Tr. at 82. After that date, in her view, his medical records revealed visits only in response to other illnesses and injuries. *Id.* On cross-examination, she explained further that platelet counts ordered after that date were likely related to B.W.'s history of ITP, but that he did not actually have ITP any time after July 8 (as his platelet counts were always normal on that date and thereafter). *Id.* at 93. She concurred with Dr. Shaer's statement that bruising alone (absent a low platelet count)—as seen in B.W.'s case more than six months after his ITP diagnosis—would not be diagnostic of ITP. *Id.* at 83. Based on her review of B.W.'s records, Dr. Gill concluded that his ITP had resolved fully within less than six months after diagnosis (and after vaccination). *Id.* at 78

Though outside her specialty, Dr. Gill was also briefly questioned by counsel for both parties about the possibility of B.W. experiencing vulnerable child syndrome or a related psychological or behavioral issue. Tr. at 85, 91. In her view, there was "absolutely no evidence" of any psychological trauma. *Id.* at 85. When asked by Petitioner's counsel to speculate about whether B.W.'s ITP diagnosis and the ensuing nonaccidental trauma investigation would have been traumatic, she guessed that any separation between B.W. and his mother likely concluded quickly, as Ms. Wright brought B.W. to his appointment the day after the investigation began. *Id.* at 97. s

### C.  *Dr. Guy Jordan*

After the hearing, Petitioner referred B.W. to a licensed psychologist, Dr. Guy Jordan, for evaluation. Dr. Jordan received his B.A. from Valdosta State College in Georgia, followed by his M. Ed. and Ph.D. from the University of Georgia. Ex. 15 at 1, filed Feb. 21, 2018 (ECF No. 45-2). He is board-certified psychologist. *Id.* Throughout his career, he has served as a clinical psychologist at Northeast Georgia Medical Center, operated an independent psychological consulting practice, and served as an adjunct professor at Brenau College. *Id.* at 2–3. He has given numerous professional presentations on topics related to families and psychological development. *Id.* at 4–5.

Dr. Jordan's ten-page report summarizes his findings from his evaluation of B.W., which took place on January 24, 2018 (nearly four years after B.W.'s March 2014 vaccinations and subsequent ITP onset). *See generally* Jordan Rep. B.W. was accompanied by Ms. Wright at this visit, and Dr. Jordan's assessments appear to be based largely on Ms. Wright's reported recollections rather than his contemporaneous observations of B.W. *See id.* at 2–3. On the basis of

these statements, he retroactively diagnosed B.W. with separation anxiety disorder lasting for approximately six months following his ITP diagnosis. *Id.* at 2.

Dr. Jordan defined separation anxiety disorder as "developmentally inappropriate and excessive fear or anxiety concerning separation from those to whom the individual is attached." Jordan Rep. at 2. He summarized Ms. Wright's description of B.W.'s changed behavior, noting:

> The mother reported that it was impossible to have sitters for the child after this incident of her child being identified as having ITP. The child's behavior changed to fighting, biting, kicking, and screaming with daycare workers. The mom was attending college and working and had to quit both college and employment to care for the child. The child would scream and would not want to stay with the aunt or with the grandmother. After the child was taken to the hospital and received testing, the child never wanted to be left at day care at the grandmother or the aunt's home. The child would kick, bite and slap to not be separated from the mother and separation anxiety symptoms were described as prevalent daily in the 2-year-old child.

*Id.* Relying on these assertions, Dr. Jordan concluded that B.W. developed separation anxiety disorder approximately four years prior, shortly after his second birthday. *Id.*

Noting that Ms. Wright described B.W.'s symptoms as lasting roughly six months, Dr. Jordan concluded that B.W.'s separation anxiety disorder lasted "approximately six months." Jordan Rep. at 2. At the time of his evaluation, B.W. continued to exhibit one trait characteristic of separation anxiety disorder: "apprehension and worry about continued care-taking by his mother being stable and uninterrupted." *Id.* at 6. Dr. Jordan stated that this trait alone is insufficient for a formal diagnosis of separation anxiety disorder, however. *Id.* at 7.

Dr. Jordan opined further that B.W.'s separation anxiety disorder arose from the experience of being diagnosed with and treated for ITP. Jordan Rep. at 2. He seems, however, to have based this conclusion almost entirely on the temporal association between the ITP diagnosis and Ms. Wright's account of when his behavior changed. *See id.* at 9.

Dr. Jordan administered both an intellectual and educational assessment to B.W. Jordan Rep. at 5. B.W. performed generally well on these tests, scoring above average in almost all categories. *Id.* at 5–6. Dr. Jordan also noted that B.W.'s ADHD is somewhat severe, despite the fact that he is medicated, and that he frequently engages in disruptive behavior. *Id.* at 6.

### D.  *Dr. Judith Miller*

In response to Dr. Jordan's assessment of B.W., Respondent consulted with an expert psychologist, Dr. Judith Miller. As reflected in her CV, Dr. Miller received her B.S., M.S., and

Ph.D. from the University of Utah. Ex. C at 1, filed May 29, 2018 (ECF No. 50-3). She currently serves as a professor of psychology in psychiatry at the University of Pennsylvania, as well as in several leadership roles in the autism program at the Children's Hospital of Philadelphia. *Id.* at 1–2. She is board-certified in psychology. *Id.* at 2. Her written publications, largely focusing on autism, have appeared in numerous medical and scientific journals. *Id.* at 16–23.

Dr. Miller prepared one eight-page report regarding this case. *See* Ex. B, filed May 29, 2018 (ECF No. 50-1) ("Miller Rep."). She criticized Dr. Jordan's conclusions, both on the basis of B.W.'s medical record and the general plausibility of a two-year-old experiencing separation anxiety disorder. *See generally id.*

Although Dr. Miller did not meet with B.W. or his mother in person, she performed a detailed review of his medical records. Miller Rep. at 2–3. Based on this review, she concluded that B.W. never experienced separation anxiety disorder. *Id.* at 8. She based this conclusion first and foremost on the fact that B.W.'s medical records reveal no concern about behavioral issues or separation anxiety following his ITP diagnosis, even though his mother brought him for frequent medical visits, which included regular behavioral screenings. *Id.* at 4–6. She highlighted numerous points in the medical record after the ITP diagnosis where Ms. Wright indicated that she had *no* concern about B.W.'s psychological condition or development. *Id.* at 3 (*e.g.*, citing Ex. 2 at 140 "9/10/14 'does not really stop playing; acts fine (despite headache); no obvious distress, jumping climbing, running, talkative,'" 177 "12/23/14 Well Child visit at 30 months. Recent medical problems? 'ITP[.]' Concerns about behavior? 'No.' Other concerns? 'No.'"). Furthermore, Dr. Miller highlighted treaters' consistent characterization of B.W. as happy, active, and playful throughout his medical record, including after vaccination. *Id.*

Dr. Miller disputed the premise of Dr. Jordan's conclusion that a change in B.W.'s behavior was evidenced by the fact that he could no longer attend daycare after vaccination. Miller Rep. at 2. She pointed out that pre-vaccination medical records also reflect that B.W. did not regularly attend daycare. *Id.*[13]

Regardless of whether B.W.'s records accurately reflect his behavior after his ITP diagnosis, Dr. Miller indicated that any diagnosis of separation anxiety disorder in a two-year old would be *highly* unusual. Miller Rep. at 6. In order for such a diagnosis to be appropriate, "the patient has to be capable of having the cognition that harm/illness/death could lead to a prolonged or permanent separation, and typically the patient is able to articulate this worry." *Id.* With regard to the crying and other behaviors recounted to Dr. Jordan by Ms. Wright, Dr. Miller explained that

---

[13] Additionally, Dr. Miller took issue with Petitioner's assertion (made primarily in written briefings, and alluded to in Dr. Shaer's testimony) that the April 2014 nonaccidental trauma investigation resulted in a lengthy separation between B.W. and his mother. Miller Rep. at 2. In her view, medical records showed that the whole investigation actually lasted only three and a half hours. *Id.* (citing Ex. 6 at 10 ("[Patient] seen at CAC for multiple bruises and low platelets, concern on physical abuse [. . .] case started at 2:30pm and case finished at 6pm")).

behaviors characteristic of separation anxiety are, in fact, developmentally appropriate for children until about age four, and thus typically would not be indicative of separation anxiety *disorder*. *Id.* In addition, because two-year-old children "are not capable of long-range thinking," they are therefore "incapable of *worrying* about or understanding the implications of a long-term separation." *Id.* (emphasis in original). For this reason, a two-year-old would not be diagnosed with separation anxiety disorder unless he exhibited "severe, prolonged, and inconsolable crying for *hours* when separated." *Id.* (emphasis in original).

Relatedly, Dr. Miller criticized Dr. Jordan's conclusion that B.W.'s worries about receiving continuous, stable care indicated the continuing presence of one trait of separation anxiety disorder at the time of his evaluation. Miller Rep. at 7–8. Reiterating that separation anxiety disorder is marked by excessive or inappropriate fear and concern, she noted that B.W. was living in foster care at the time of his evaluation, making such fears entirely reasonable for a child of his age and living situation. *Id.*

## IV.   Applicable Legal Standards

### A.   *Burden of Proof for Table Claims*

Petitioner pleaded her case as a Table claim. Pet. at 5. Table claim petitioners need not independently demonstrate that the vaccine at issue can cause the claimed injury, nor that the vaccine did cause the injury in that case. *Shalala v. Whitecotton*, 514 U.S. 268, 270 (1995). Instead, so long as the claimed injury occurred within a medically reasonable time frame following vaccination, causation is presumed. *Id.*

This presumption of causation does not excuse Table claim petitioners from other statutory requirements for compensation, however. *Song v. Sec'y of Health & Human Servs.*, 31 Fed. Cl. 61, 65 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994) (unpublished table decision); *Crabbe v. Sec'y of Health & Human Servs.*, No. 10-762V, 2011 WL 4436724, at *1 (Fed. Cl. Spec. Mstr. Aug. 26, 2011). Thus, Table or not, Vaccine Program claimants not asserting a vaccine-related death or other injury requiring a surgical intervention and inpatient care must demonstrate that they suffered the residual effects or complications from their vaccine-related injury for more than six months. Section 11(c)(1)(D).

### B.   *Analysis of Fact Evidence*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the

record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, provided that such determination is evidenced by a rational determination).

Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). This presumption is based on the linked propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993). Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).

In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later statements: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

## C.  *Analysis of Expert Evidence*

Petitioners regularly present statements from medical experts in support of their claims. *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Respondent frequently offers one or more experts of his own in order to rebut a petitioner's case. Where both sides offer expert reports, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of*

*Health & Human Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder ex rel. Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706 at 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Human Servs.*, No. 08-601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review denied*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x 999 (Fed. Cir. 2013) (citing *Cedillo v. Sec'y of Health & Human Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010)).

Expert opinions based on unsupported facts may be given relatively little weight. *See Dobrydnev v. Sec'y of Health & Human Servs.*, 556 F. App'x 976, 992–93 (Fed. Cir. 2014) ("[a] doctor's conclusion is only as good as the facts upon which it is based") (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("[w]hen an expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion"). Expert opinions that fail to address or are at odds with contemporaneous medical records may therefore be less persuasive than those which correspond to such records. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013), *aff'd*, 127 Fed. Cl. 299 (2014).

Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly ex rel. Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1325–26 (Fed. Cir. 2010) ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Human Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D.   *Consideration of Medical Literature*

Respondent filed medical and scientific literature in this case, but not every filed item factors into the outcome of this decision. While I have reviewed all of the medical literature submitted in this case, I discuss only those articles that are most relevant to my determination or are central to Petitioner's case. *Moriarty v. Sec'y of Health & Human Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citing *Hazlehurst v. Sec'y of Health & Human Servs.*, 604 F.3d 1343, 1352 (Fed. Cir. 2010)); see also *Paterek v. Sec'y of Health & Human Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding

certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

## ANALYSIS

As previously noted, this case turns *not* on whether B.W. developed ITP within a medically-appropriate time frame after receiving the MMR vaccine, or whether he had ITP (a recognized Table injury related to the MMR vaccine), but rather on whether Petitioner has made a sufficient showing to satisfy the six-month residual effects requirement. Petitioner puts forth two arguments in this regard: first, that the ongoing monitoring of B.W.'s platelet count satisfies the requirement, and second, that B.W. suffered a diagnosable psychological disorder as a result of his ITP that lasted longer than six months. Pet'r Br. At 8–17. Respondent contends that medical monitoring such as platelet counts does not satisfy the six-month requirement, and that B.W. did not suffer a psychological disorder or other mental illness as a result of his ITP. Resp't's Br. in Support of Dismissal at 2–4, filed Sept. 28, 2018 (ECF No. 51) ("Resp't Br.").

### I.     Ongoing Monitoring Does Not Satisfy the Six-Month Residual Effects Requirement

Petitioner first argues that B.W. satisfies the six-month residual effects requirement through the "ongoing medical management" of his ITP in the form of platelet count checks that occurred intermittently over the months following his diagnosis. Pet'r Br. at 8. However, the present case is facially indistinguishable from *Crabbe*, in which a special master found that recurrent blood testing did not satisfy the six-month residual effects requirement for a petitioner who suffered ITP after vaccination. 2011 WL 4436724, at *5. There, the special master found that "[a]lthough it is possible that the history of ITP prompted [the petitioner's] physicians to order blood tests that they might not have ordered otherwise, testing for a possible recurrence is not a 'residual effect' within the meaning of the statute." *Id.*

Petitioner unsuccessfully attempts to distinguish her case from *Crabbe* by characterizing subsequent platelet counts as "management" of B.W.'s ITP. *See, e.g.*, Pet'r Br. at 10. Using this term does not change the fact that such blood tests were done only to test for potential recurrence of B.W.'s ITP, not to manage existing symptoms or sequelae thereof.

In my post-hearing Order, I explicitly rejected Petitioner's argument that "subsequent monitoring of a resolved condition that has never recurred can satisfy the Act's severity requirement." Post-Hr'g Order at 1. My view on this issue has not changed, and I conclude that ongoing monitoring for possible ITP recurrence fails to satisfy the six-month residual effects requirement.

## II.     Petitioner Has Failed to Show that B.W. Suffered a Vaccine Injury-Related Psychological Disorder or Mental Illness

Petitioner asserts that B.W. suffered a psychological disorder or mental illness as a result of his ITP for more than six months, thereby satisfying the six-month residual effects requirement. Pet'r Br. at 13. It is true that psychological sequelae of a vaccine-related injury may be sufficient to satisfy the six-month residual effects requirement. *See, e.g.*, *Tauer v. Sec'y of Health & Human Servs.*, No. 08-703V, 2009 WL 2045676, at *1 (Fed. Cl. Spec. Mstr. June 22, 2009) (decision on stipulation). Here, however, I do not find that Petitioner has sufficiently demonstrated that B.W. suffered such an injury, nor that any psychological trauma he may arguably have experienced could be explicitly linked to his ITP.

First, the record does not support the conclusion that B.W. suffered from separation anxiety disorder beginning in the spring or summer of 2014, and after B.W.'s ITP diagnosis. There is no such contemporaneous diagnosis in the medical record filed in this case, and so Petitioner relies solely on Dr. Jordan's professional opinion. However, although I do not question Dr. Jordan's qualifications as a psychologist, the specifics of his diagnosis are undercut by the lapse in time between the alleged disorder and Dr. Jordan's evaluation nearly four years later. It is also readily apparent from Dr. Jordan's report that he bases his diagnosis almost entirely on Ms. Wright's recounted statements, which cannot be confirmed through any source of evidence (as she did not testify, provide a written affidavit, or provide any other form of record support for her assertions).

Petitioner attempts to cure the hearsay nature of her statements to Dr. Jordan recalling B.W.'s status in 2014 by asking for the opportunity to present her own live testimony on these matters at yet another fact hearing. Pet'r Br. at 16. But hearing live testimony on this topic from Ms. Wright would not aid her claim. The fundamental fact remains that the record does not suggest that B.W. experienced notable anxiety or psychologic distress beginning around the time his ITP manifested, so Petitioner's testimony would be seeking to vary contemporaneous records that are presumed accurate, as numerous Program decisions have observed. *See, e.g.*, *Burns*, 3 F.3d at 417. Also, Petitioner has already had ample opportunities to offer substantiation for these allegations, but has submitted nothing along the lines of witness statements or other corroborative evidence in support. And in any event, I would still require persuasive expert support for the diagnosis— bringing me back to Dr. Jordan, whose opinion is too thinly bulwarked by corroborative proof beyond the Petitioner's unsupported statements to be reliable. *See Dobrydnev*, 556 F. App'x at 992–93 (citing *Brooke Group Ltd.*, 509 U.S. at 242 (finding expert opinions based on unsupported factual allegations to be worthy of little to no weight).

Similarly, Dr. Jordan's finding that B.W.'s separation anxiety disorder lasted for approximately six months—a critical component to satisfaction of the severity requirement— appears conclusory. He seems to accept Ms. Wright's assertion that B.W.'s behavioral changes

lasted for six months despite the fact that medical records indicate no significant change in B.W.'s demeanor around that time. And many of the statements upon which Dr. Jordan bases his diagnosis are unsupported by or at odds with other evidence. For example, while Dr. Jordan notes that B.W. had to cease attending daycare due to behavioral issues (Jordan Rep. at 2), medical records consistently reflect that B.W. did not attend daycare either before or after vaccination. *See, e.g.*, Ex. 2 at 15, 30, 57, 85. Furthermore, Dr. Jordan appears to unquestioningly accept Ms. Wright's characterization of B.W. as anxious, confrontational, and unhappy after his ITP diagnosis, contrary to medical records that consistently describe him as happy and playful. *See, e.g.*, *id.* at 92, 121.

In addition, regardless of the factual discrepancies between Dr. Jordan's report and B.W.'s medical records, Respondent's expert has persuasively established that it is highly unlikely that a two-year-old such as B.W. *could* have developed separation anxiety disorder. As explained by Dr. Miller, children of such a young age are cognitively incapable of worrying about the future in a manner necessary for a diagnosis of separation anxiety disorder, and it is developmentally appropriate for two-year-old children to display some separation anxiety behaviors. Miller Rep. at 6. Dr. Jordan's report does not distinguish between the ordinary separation anxiety behaviors exhibited by healthy two-year-old children and the excessive, inappropriate responses that would characterize a true separation anxiety *disorder*. Accordingly, I find that any separation anxiety behavior that B.W. may have displayed as a two-year-old was more likely developmentally-appropriate behavior for a child of his age than a disproportionate reaction to his ITP diagnosis.

Furthermore, I find that even if Petitioner could substantiate her claim that B.W. suffered from some other psychological distress, she has not persuasively related such a condition to the ITP diagnosis. Dr. Jordan's attribution of such symptoms to B.W.'s ITP diagnosis and treatment seems to be based largely on a temporal association alone. He notes that "[n]o separation anxiety had been experienced prior to the identification and treatment of his ITP. It therefore appears that the development of ITP and subsequent medical treatment created the separation anxiety symptoms." Jordan Rep. at 9. But it is well-established in the Vaccine Program that temporal associations alone do not suffice to show causation. *See McCarren v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 142, 147 (1997). Furthermore, although Dr. Jordan acknowledges other elements of B.W.'s life that could be linked to behavioral issues and psychological trauma,[14] he does not address whether these could have played a greater role in bringing about the alleged changes in B.W.'s behavior.[15]

---

[14] *See* Jordan Rep. at 1 (noting nonaccidental trauma investigation following ITP diagnosis), 4 (noting that B.W. was diagnosed with ADHD at age 3; that B.W. lived with his mother and siblings in a trailer without ready access to running water in 2016; and that B.W. was placed in foster care in the fall of 2016).

[15] In addition to arguing that B.W. experienced psychological trauma as the direct result of his ITP, Petitioner also seems to suggest that the April 2014 nonaccidental trauma investigation that was prompted by initial treater discovery of B.W.'s bruises (which were not initially understood to be evidence ITP but rather of potential abuse) also had a psychological impact on him, given that it led to his removal from her home for a period of time. Pet'r Br. at 5.

Testimony from Dr. Shaer about a possible diagnosis of vulnerable child syndrome (which would occur as a result of the ITP diagnosis) is similarly unpersuasive. Her statements were too speculative (based entirely on Ms. Wright's demeanor, not on B.W.'s) and well outside her area of medical expertise, as she acknowledged. *See* Tr. at 32–33. Dr. Jordan otherwise concluded that B.W. did not experience vulnerable child syndrome. Jordan Rep. at 4.

Ultimately, I find Dr. Miller's assessment of B.W.'s psychological course following his ITP diagnosis to be more persuasive than Dr. Jordan's. Accordingly, I conclude that Petitioner has failed to show by preponderant evidence that B.W. experienced separation anxiety disorder or another psychological injury for more than six months after vaccination.[16]

## CONCLUSION

Having reviewed the medical records, expert reports, medical literature, and the parties' respective arguments, I do not find that Petitioner has shown with sufficient preponderant evidence

---

Accordingly, this more indirect effect of the ITP could also be a cause of a sequela sufficient to satisfy the severity requirement.

Petitioner's argument is not without merit. An investigation for nonaccidental trauma certainly has the potential to be stressful and anxiety-inducing (although B.W.'s life had already been marked by significant instability not connected to his ITP). However, Petitioner has not corroborated with evidence any facts about the extent, nature, or scope of this investigation, making it difficult to conclude in the first place that it could have caused trauma at all. In particular, it is not clear how long the investigation lasted, or how long B.W. was in fact separated from his mother. *See, e.g.*, Pet'r Br. at 5 (separation lasted "some time"); Ex. 9 at 15 (note from April 21, 2016 doctor's visit: "has a court case involving his ITP? abuse"); Tr. at 97 (Dr. Gill noting that Ms. Wright brought B.W. in for doctor's visit the day after nonaccidental trauma investigation began, concluding from that fact that separation lasted less than one day); Miller Rep. at 2 (citing Ex. 6 at 10, reading "case started at 2:30pm and case finished at 6pm" to mean that investigation lasted three and a half hours). And even if the investigation due to misapprehension about the causes of B.W.'s bruises was sufficient to have caused him psychological harm, Petitioner has not demonstrated that such harm persisted for more than six months, for the reasons stated above (i.e., record evidence does not suggest B.W. was psychologically abnormal, Dr. Miller was more persuasive than Dr. Jordan in establishing a lack of such trauma based on the record, etc.).

[16] In ruling as I do, I am opting to resolve the secondary question of a possible sequela of B.W.'s ITP on the record, rather than via hearing. I am empowered to do so under the Act, which gives special masters broad discretion in determining how best to resolve claims. *See generally* Section 12(d); *see also* Vaccine Rule 8(d). Previous decisions have affirmed the propriety of resolving a vaccine claim without hearing when live testimony would not be dispositive in the matter. *See, e.g.*, *D'Tiole v. Sec'y of Health & Human Servs.*, 726 F. App'x 809, 812 (Fed. Cir. 2018); *Hooker v. Sec'y of Health & Human Servs.*, No. 02-472V, 2016 WL 3456435, at *21 (Fed. Cl. Spec. Mstr. May 19, 2016) (discussing a special master's discretion in holding a hearing and the factors that weighed against holding a hearing in the matter); *Murphy, v. Sec'y of Health & Human Servs.*, No. 90-882V, 1991 WL 71500, at *2 (Cl. Ct. Spec. Mstr. Apr. 19, 1991) (finding no justification for a hearing where the claim is fully developed in the written records and the special master does not need to observe the fact witnesses for the purpose of assessing credibility). Here, the lack of evidence supporting Petitioner's severity allegations can be determined based solely on the record plus the expert reports of Drs. Jordan and Miller. To the extent that record does not include witness statements from Petitioner or others that might have corroborated her allegations, that insufficiency is solely the product of Petitioner's failure to offer such evidence at the proper time (such as at the fall 2017 hearing, or prior to the present decision).

that B.W.'s ITP or its residual effects lasted for more than six months. Accordingly, Petitioner has not established entitlement to an award of damages and I must **DISMISS** her claim.[17]

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Special Master

---

[17] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.