# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 16-498V
### (To be published)

* * * * * * * * * * * * * * * * * * * * * * * *

HEATHER WRIGHT,
*as Mother and Natural Guardian of minor child, B.W.,*

                Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                Respondent.

* * * * * * * * * * * * * * * * * * * * * * * *

Chief Special Master Corcoran

Filed: September 25, 2020

Immune Thrombocytopenic Purpura ("ITP"); Measles-Mumps-Rubella ("MMR") Vaccine; Damages; Emotional Distress; Vulnerable Child Syndrome.

*Leah V. Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.

*Traci R. Patton*, U.S. Dep't of Justice, Washington, DC, for Respondent.

## DECISION FINDING ENTITLEMENT AND AWARDING DAMAGES[1]

Heather Wright, as legal representative of her child, B.W.,[2] filed a petition on April 21, 2016, seeking compensation under the National Vaccine Injury Compensation Program ("Vaccine

---

[1] This Decision will be posted on the Court of Federal Claims' website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means that the Decision will be available to anyone with access to the internet.** As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its current form. *Id.*

[2] Petitioner's counsel previously indicated that she had not been able to contact Ms. Wright for several months, raising the question of whether she should remain as Petitioner. Counsel has since filed a Status Report indicating that she has been able to resume communication with Ms. Wright, who intends to remain B.W.'s representative in the matter. Status Report, filed Aug. 14, 2020 (ECF No. 75).

Program").[3] ECF No. 1. Petitioner alleged that the measles-mumps-rubella ("MMR") vaccine B.W. received on March 28, 2014, caused him to develop immune thrombocytopenic purpura ("ITP"). Pet. at 1. After a fact hearing the matter was dismissed, but Petitioner's appeal was successful, returning the case to a litigation track. Respondent filed an Amended Rule 4(c) Report on November 8, 2019, representing that he would no longer defend the case, and after the parties were unable to resolve damages on their own, I ordered them to commence briefing the matter for my resolution.

In total, Petitioner requests $100,000.00 in past pain and suffering, and $4,345.55 in satisfaction of a Medicaid lien sought by the State of Georgia. Petitioner's Damages Brief at 4, filed Feb. 21, 2020 (ECF No. 70) ("Pet. Damages Brief"). Based on my review of the record and the parties' submissions, I find that Petitioner is entitled to damages in this case, because she has established a Table claim based on B.W.'s ITP after receipt of the MMR vaccine. However, the amount of that award shall be **$25,000.00** in actual pain and suffering, plus $4,345.55 in satisfaction of the Medicaid lien. The basis for my determination is set forth below.

## I.    Brief Factual History

B.W. was born on March 21, 2012. Ex. 2 at 57, filed July 6, 2016 (ECF No. 6). Before receiving the MMR vaccine, he was in generally good health, though somewhat behind schedule on his vaccinations. *Id.* at 57–61. At his two-year-old well-child visit on March 28, 2014, B.W. underwent his twenty-four-month development screening. *Id.* at 58–59. He was found to be developing normally and no behavioral concerns were noted. *Id.* At this visit, B.W. also received several vaccinations, including MMR. *Id.* at 53–54, 58–60.

Approximately two weeks later, on April 15, 2014, B.W. presented at the emergency room at Ty Cobb Regional Medical Center in Lavonia, Georgia, accompanied by his father and paternal grandmother, with bruises on his forehead, abdomen, and all four extremities. Ex. 3 at 3–4, filed Apr. 22, 2016 (ECF No. 6).[4] Within a matter of hours, lab results revealed that B.W.'s platelet count was only 43,000—far below the normal range of 150,000 to 400,000.[5] *Id.* at 13. He was

---

[3] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10–37 (2012) (hereinafter "Vaccine Act" or "the Act"). Individual section references hereafter shall refer to § 300aa of the Act.

[4] B.W.'s bruises were sufficiently severe to raise concerns that they might have been the result of nonaccidental trauma, so treaters contacted law enforcement, who investigated Ms. Wright for possible child abuse. Ex. 4 at 74, filed Apr. 22, 2016 (ECF No. 6). The duration and depth of this investigation are unclear from the record as filed.

[5] Platelet counts reveal "the number of platelets (thrombocytes) per cubic milliliter of blood." *Crabbe v. Sec'y of Health & Hum. Servs.*, No. 10-762V, 2011 WL 4436724, at *2 n.9 (citing Pagana et al., *Mosby's Manual of Diagnostic and Laboratory Tests* 416 (4th ed. 2010)).

diagnosed with thrombocytopenia (a condition characterized by abnormally low platelet levels)[6] and discharged to his father and grandmother's care that same evening. *Id.* at 8.

The following day, B.W. arrived at Children's Hospital of Atlanta ("CHOA") by ambulance. Ex. 4 at 45–46. Notes from this visit reflect some initial treater uncertainty about whether his bruising reflected nonaccidental trauma or ITP (*see id.* at 74; Ex. 2 at 66), but treaters again ultimately concluded that his low platelet count (68,000 that day) established the presence of ITP. Ex. 4 at 91. B.W. was discharged to his mother's care later that evening with a diagnosis of "thrombocytopenia likely secondary to acute ITP." *Id.*

Over the following weeks, B.W. saw various pediatricians at the Longstreet Clinic in Gainesville, Georgia, for frequent blood checks. *See* Ex. 2 at 88, 94, 102, 107, 115, 117. His platelet counts fluctuated significantly over these visits: 180,000 on April 21; 68,000 on May 2; and 111,000 on May 7. *Id.* at 88, 94, 115. However, his bruising, though still visible, did not appear to worsen. *See id.* at 90, 107, 113. Following an April 29th visit with pediatrician Garrick Bailey, M.D., B.W. was referred to hematology for more detailed analysis of his blood condition. *Id.* at 101. B.W. saw two hematologists at CHOA, Benjamin Watkins, M.D., and Michael Briones, D.O. *Id.* at 123–28. They concluded that he had ITP resulting from his MMR vaccination, but noted that his thrombocytopenia was "not severe at this time" and recommended follow-up visits "every 1–2 months until resolution." *Id.* at 127.

On July 8, 2014—less than three months after onset of his ITP (in the form of the visible bruising)—B.W. presented to Dr. Bailey for a platelet count at Petitioner's request. Ex. 2 at 142. At that visit, Dr. Bailey noted that B.W.'s ITP had "resolved." *Id.* at 144. B.W. thereafter never returned to a hematologist for official clearance.[7] Sporadic platelet count checks over the following months never showed platelet counts outside the normal range. *See, e.g.*, *id.* at 136 (platelet count of 312,000 on September 10). These checks were conducted at visits for other complaints in response to concerns about B.W.'s history of ITP. *See, e.g.*, *id.* at 136 (September 10th visit for headache), 155 (January 26, 2015 visit for bruising on shins and abdomen).

Since resolution of his ITP, B.W. has largely remained in good physical health. Petitioner has, however, offered evidence that at age three and a half years B.W. was diagnosed with attention deficit hyperactivity disorder ("ADHD"). Ex. 14 at 4, filed Feb. 21, 2018 (ECF No. 45-1) ("Jordan Rep.").[8] Notes from treaters, both before and after his ADHD diagnosis, consistently characterize

---

[6] *Dorland's Illustrated Medical Dictionary* 1892 (33d ed. 2020).

[7] A follow-up with Drs. Watkins and Briones was scheduled for June 10, 2014. Ex. 2 at 128. However, Ms. Wright stated that she canceled this follow-up visit due to a stomach bug. Ex. 9 at 15, filed July 6, 2016 (ECF No. 9-2). She did not reschedule. *Id.*

[8] While Petitioner informed Dr. Guy Jordan that B.W. had been diagnosed with ADHD and prescribed Adderall at age three and a half (Jordan Rep. at 4), the medical records filed in this case provide no clear support for such a

B.W. as very active, playful, and happy. *See* Ex. 2 at 92, 121 (notes from April 18, 2014: "[n]o obvious distress, active, happy, appropriate for age;" May 2, 2014: "[n]o obvious distress, interactive, very playful/active"); Ex. 9 at 27 (January 21, 2016: "smiles, playful, and active and alert"). Medical records do not reflect any stated concerns from Ms. Wright about her son's psychological well-being or behavioral development, except for concerns about excessive activity levels. *See* Ex. 2 at 140, 177–78; Ex. 6 at 21; Ex. 9 at 11–12.

## II.     Procedural History

As noted above, Petitioner filed her claim on April 21, 2016. Medical records were filed over the coming months. Then, on September 21, 2016, Respondent filed a combined Rule 4(c) Report and Motion to Dismiss, arguing that Petitioner could not meet the severity requirement under the Vaccine Act, given that the record seemed to support the conclusion that B.W.'s ITP had resolved in less than six months from onset. Petitioner responded to the Motion to Dismiss on October 5, 2016, and Respondent filed his Reply on October 28, 2016. The parties filed expert reports from Drs. Shaer and Gill in early 2017.

The case was originally assigned to the Office of Special Masters' Special Processing Unit (as it was deemed likely to settle), but it was reassigned to me after Respondent raised the severity issue as a roadblock to the claim. I thereafter inquired of the parties as to whether a hearing would help resolve the issue, and they agreed. To that end, both filed prehearing briefs on September 8, 2017, and a one-day hearing took place on September 21, 2017. During the hearing, the testimony of one expert per side (Dr. Shaer for Petitioner, Dr. Gill for Respondent) was heard.

After the hearing, I informed Petitioner that my preliminary determination was that she could not establish severity based solely on the need for ongoing platelet count testing (which the record conclusively establishes did not reveal recurrence of the problem), but that she might be able to do so if she better substantiated her contention that B.W. had experienced subsequent psychological sequelae that lasted more than six months post-onset. To that end, Petitioner filed a post-hearing brief on December 29, 2017, and Respondent did the same on February 12, 2018. The parties also filed expert reports from Drs. Jordan and Miller regarding B.W.'s psychological condition post-vaccination. Respondent submitted his final brief in support of dismissal on September 28, 2018, and Petitioner responded on November 30, 2018.

On January 18, 2019, I issued a Decision denying entitlement, based on my interpretation of case law pertaining to ITP platelet testing post-onset. Decision, filed Jan. 18, 2019 (ECF No. 53). Thereafter, Petitioner filed a Motion for Review on February 19, 2019, and the parties further briefed the issue of the six-month severity requirement before oral argument, which was held on

---

diagnosis during the stated time period. *See, e.g.*, Ex. 9 at 7, 46, (no current medications listed at May 6, 2016 visit; ADD and ADHD listed as negative in past medical history at April 21, 2016 visit).

July 11, 2019. Motion for Review, filed Feb. 19, 2019 (ECF No. 54). On July 16, 2019, Petitioner's Motion for Review was granted, with the Court of Federal Claims determining that post-onset platelet count testing for more than six months after vaccine administration was sufficient to establish severity. Reported Opinion, filed July 16, 2019 (ECF No. 60). The case was remanded to me for further consideration.

I thereafter conferred with the parties, informing them of my view that Petitioner could now likely meet the requirements of a Table claim and urging them to consider settlement. Minute entry, dated Aug. 16, 2019. Respondent filed an Amended Rule 4(c) Report on November 8, 2019 indicating that he would no longer defend the case, and on December 16, 2019, I ordered the parties to brief damages, since they were unable to settle the matter themselves. The parties completed this process on May 28, 2020.

### III.    Damages Evidence - Experts

I include herein a brief overview of the expert testimony and opinions offered throughout the case and bearing on the damages issue to be decided.

### A.    *2017 Hearing Testimony*

#### 1.    Petitioner's Expert – Dr. Catherine Shaer, M.D.

Dr. Shaer received her bachelor's degree from Quinnipiac College in Hamden, Connecticut, and her medical degree from University of Texas Health Science Center in San Antonio. Ex. 12 at 1, filed Feb. 3, 2017 (ECF No. 22-2). She completed a three-year residency in pediatrics at Children's National Medical Center in Washington, D.C. in 1981 and is board-certified in pediatrics. *Id.* She served for many years as the medical director of the spina bifida program at Children's National Medical Center. *Id.* at 3. From 2008 to 2014, Dr. Shaer worked as a medical officer at the Health and Human Services Division of Vaccine Injury Compensation, where she reviewed Vaccine Program claims on behalf of Respondent. *Id.* at 2. For the past four years, she has done similar work for petitioners' attorneys, reviewing potential vaccine claims and offering testimony and reports on behalf of Vaccine Program claimants. *Id.* at 1. She published articles, most often on spina bifida, in several medical journals throughout the late 1980s and 1990s. *Id.* at 7–8.

Dr. Shaer's two-page expert report mostly focused on her conclusion that later-in-time blood draws B.W. received could be directly attributed to his April 2014 ITP diagnosis, and her testimony at hearing was consistent with the report. *See generally* Ex. 11, filed Feb. 3, 2017 (ECF No. 22-1); Tr. at 19, 44-45. She thus opined that the residual effects of B.W.'s ITP lasted longer than six months. Tr. at 21. She conceded, however, that B.W.'s platelet count did not fall to levels

constituting thrombocytopenia at any time more than six months after his initial diagnosis, and agreed that notes from treating physicians reflected that his ITP had in fact resolved by July 8, 2014, despite ongoing testing thereafter. *Id.* at 54–56, 64.

Dr. Shaer's report did not discuss B.W.'s psychological condition prior to or following his ITP diagnosis. However, she testified about a September 2015 phone conversation she had with Ms. Wright and offered some opinions about how Ms. Wright's response to B.W.'s ITP diagnosis might play into his behavioral development. Tr. at 29–38. In this call, Ms. Wright purportedly informed Dr. Shaer that B.W. presented in April 2014 with an alarmingly large bruise on his side, which medical professionals feared could be due to nonaccidental trauma. *Id.* at 30. An investigation involving police departments from multiple jurisdictions ensued, during which B.W. was separated from his mother. *Id.* at 30–31. Dr. Shaer was unsure how long this period of separation lasted. *Id.* at 30.

More specifically, Dr. Shaer testified that Petitioner had mentioned to her[9] that B.W.'s behavior changed "after all this happened," and he became "hard to control." Tr. at 32. Dr. Shaer accordingly speculated that any changes in B.W.'s demeanor as a result of his ITP diagnosis might be attributable in part to a form of vulnerable child syndrome. *Id.* at 32–35. Vulnerable child syndrome, Dr. Shaer explained, occurs when a parent responds to her child's health problems with excessive and irrational levels of concern, which can influence the nature of her interactions with the child. *Id.* at 32–33. This in turn can affect the sick child's behavior. *Id.* at 34. Dr. Shaer noted that presentation of vulnerable child syndrome varies widely—some children may begin to have temper tantrums, while others may become quiet and withdrawn. *Id.*

In Dr. Shaer's view, the degree of concern Ms. Wright expressed about B.W.'s ITP was excessive, exaggerated, and irrational, which she posited could affect B.W.'s behavior. Tr. at 32, 38 (noting that "the mother took the trauma well beyond what I would consider rational, and I think it's certainly reasonable to…consider that that could have affected the child because I don't see how it couldn't."), 57 (emphasizing that she "was concerned about [Ms. Wright's] reaction to this whole thing and its effect on the child…" and she "thought that [Ms. Wright] was…that long after this episode that she…it was almost like she was in the throes of it again. It was a very exaggerated response and the way she spoke about it with so much emotion and fear in her voice concerned me."). She noted that Ms. Wright demonstrated ongoing anxiety and fear about B.W.'s condition, and that she appeared to believe her child continued to suffer from ITP, even though he had long been stable at the time of their conversation. *Id.* at 31, 69. Dr. Shaer admitted, however, that the tests B.W. underwent were not likely to be painful or traumatizing, and again focused on *Ms. Wright's* likely reaction to such procedures, reiterating that excessive concern on her part

---

[9] Dr. Shaer noted at least one instance in which Ms. Wright was inaccurate in her recollection of events. Tr. at 30. She also acknowledged that Ms. Wright "couldn't explain to me things in a logical fashion. She's not the most clear, sort of focused person." Tr. at 38.

could in turn affect B.W. *Id.* at 36–38. She also noted that B.W. had "a very chaotic family situation" and acknowledged that "[t]here's a lot of reasons children could have developmental or behavioral problems." Tr. at 35, 38.

Ultimately, Dr. Shaer did not consider a specific diagnosis of vulnerable child syndrome to be particularly important in this case. She stated that "we can even forget that term," emphasizing instead that Ms. Wright's response to B.W.'s diagnosis was of such a nature that she felt B.W. should receive some kind of psychological examination in order to ascertain the full extent of how his mother's reaction to his ITP might be affecting his behavior. Tr. at 39. On cross-examination, however, she conceded that nothing in B.W.'s medical record showed any signs of behavioral or psychological problems. *Id.* at 58, 66.

2.     Respondent's Expert – Dr. Joan Gill, M.D.

Dr. Gill's testimony at the fact hearing[10] was consistent with her written report, and largely focused on the timeframe in which B.W.'s ITP resolved. Ex. B at 1–2, filed May 23, 2017 (ECF No. 28-1); Tr. at 78, 82. She was, however, briefly questioned by counsel for both parties about the possibility that B.W. experienced vulnerable child syndrome or a related psychological or behavioral issue, as Dr. Shaer had suggested, and she denied seeing record evidence of either. Tr. at 85, 91. When asked by Petitioner's counsel to speculate about whether B.W.'s ITP diagnosis and the ensuing nonaccidental trauma investigation would have been traumatic, she speculated that any separation between B.W. and his mother likely concluded quickly, as Ms. Wright brought B.W. to his appointment the day after the investigation began, and that such an experience was unlikely to be psychologically traumatic in so young a child. *Id.* at 97.

B.     *Post-Hearing Expert Opinions Specific to Damages and Severity*

1.     Petitioner's Expert – Dr. Guy Jordan, Ph.D.

Petitioner offered a single expert report from a psychologist, Dr. Guy Jordan. *See generally* Jordan Rep. According to Dr. Jordan's evaluation, which was conducted after the September 2017

---

[10] As noted on her CV, Dr. Gill received her bachelor's degree from St. Norbert College in West De Pere, Wisconsin, and her medical degree from the Medical College of Wisconsin in Milwaukee. Ex. C at 1, filed May 23, 2017 (ECF No. 28-4). She completed both a pediatric internship and residency at Milwaukee Children's Hospital, followed by a fellowship in pediatric hematology-oncology at the Medical College of Wisconsin and the Blood Center of Southeastern Wisconsin. *Id.* at 1–2. Dr. Gill was board certified in pediatric hematology/oncology, and she served as a professor, first of pediatrics and more recently of population health and epidemiology, at the Medical College of Wisconsin since 1981. *Id.* at 2, 4. Her numerous publications on blood disorders have appeared in many medical journals. *Id.* at 11–25. Dr. Gill is now deceased.

fact hearing, B.W. suffered from Separation Anxiety Disorder and behavioral disturbances as a result of his ITP and the efforts to treat it.

Dr. Jordan received his bachelor's degree in Psychology from Valdosta State College. Dr. Jordan Curriculum Vitae, filed as Ex. 15 on Feb. 21, 2018 (ECF No. 45-2) at 1. He then obtained his Master of Education in Educational Psychology followed by his Ph.D. in Educational Psychology from the University of Georgia. *Id.* Dr. Jordan has been licensed to practice in the state of Georgia since 1983. *Id.* Throughout his career, Dr. Jordan has served as a consultant and educator in the areas of clinical and school psychology. *Id.* at 2–4. He has also published some articles discussing topics such as child development and school psychology. *Id.* at 4–5.

Dr. Jordan's evaluation begins with a detailed history of B.W.'s condition and psychological state, based upon a history provided by Petitioner. Jordan Rep. at 1–2. B.W. was reported to have been a well-behaved baby and was developing normally prior to the receipt of several vaccines in March 2014. *Id.* at 2. But his behavior purportedly changed drastically following the onset of his ITP, and B.W. began fighting, kicking, biting, and screaming at daycare workers and babysitters. *Id.* As a result, B.W. was unable to attend daycare and Ms. Wright was unable to obtain childcare for him. *Id.* Petitioner also told Dr. Jordan that B.W. would exhibit violent behaviors, such as screaming, slapping, biting, and kicking, and would refuse to stay with family members in the absence of his mother. *Id.* This constellation of behaviors persisted for approximately six months. *Id.*

In Dr. Jordan's view, these behaviors were consistent with a diagnosis of Separation Anxiety Disorder, which he opined could have been triggered by the forced separation of B.W. from his mother during his initial hospitalization, diagnosis, and treatment for ITP in April 2014. Jordan Rep. at 3. Dr. Jordan described Separation Anxiety Disorder as "fear and apprehension in a child when separated from the primary caregiver and fear reaction is exaggerated and more intense than the circumstances should trigger." *Id.* He emphasized that a single event—such as B.W.'s initial hospitalization—could be sufficient to induce separation anxiety symptoms. *Id.* Dr. Jordan also noted that B.W. experienced improvement in his symptoms after being reunited with his mother and reestablished with his daily routine. *Id.*

This improvement, however, was limited, and according to Ms. Wright, B.W. was subsequently diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and prescribed Adderall.[11] Jordan Rep. at 4. This intervention again resulted in some improvement, but Ms. Wright continued to express concerns regarding B.W.'s behavior at pre-school. Specifically, she noted that B.W. is more immature and selfish than other children his age. *Id.* These behavioral

---

[11] While Petitioner informed Dr. Jordan that B.W. had been diagnosed with ADHD and prescribed Adderall at age three and a half (Jordan Rep. at 4), the medical records filed in this case provide no clear support for such a diagnosis during the stated time period. *See, e.g.,* Ex. 9 at 7, 46, (no current medications listed at May 6, 2016 visit; ADD and ADHD listed as negative in past medical history at April 21, 2016 visit).

issues persisted following B.W.'s placement in foster care, which coincided with his starting kindergarten. *Id.* B.W.'s foster parents reported that he was easily distracted, talkative, and unable to sit still and pay attention. *Id.* B.W. was prescribed additional medication to alleviate these symptoms, and his foster parents reported improvement in his social behaviors as a result. *Id.* at 5. B.W.'s teacher, however, continues to express concerns regarding B.W.'s ADHD symptoms, including fidgeting, talkativeness, interrupting other children, playing rough, and delayed development in the areas of language, comprehension, articulation, and motor coordination. *Id.* As part of Dr. Jordan's evaluation, B.W. participated in intellectual and educational assessments and scored above average in most categories. *Id.* at 5–6. Given these results, Dr. Jordan indicated that B.W. will likely be successful in school as long as his ADHD symptoms are adequately managed. *Id.* Dr. Jordan did not attribute B.W.'s ADHD to his ITP diagnosis or treatment. *Id.* at 9 ("The etiology of the ADHD is unknown…").

In January 2018—nearly four years after B.W.'s ITP diagnosis—Dr. Jordan conducted an interview with B.W., during which B.W. reported an incident where he bruised himself around the eye after running into another child. Jordan Rep. at 6. He indicated that the bruise took a while to resolve, but he was unable to provide a specific timeline. *Id.* He also expressed sadness at being taken away from his mother as a general matter and questioned what would happen to him if everyone in his family died. *Id.* Dr. Jordan explained that these feelings and questions are consistent with Separation Anxiety Disorder, though they are not sufficient to support a formal diagnosis of mental illness. *Id.*

Dr. Jordan also explained, however, his view (contrary to Dr. Shaer's) that it was unlikely that B.W. suffered from vulnerable child syndrome. Jordan Rep. at 4. He opined that the steps Ms. Wright took in obtaining care for her son's condition were appropriate and responsible. *Id.* He felt that Ms. Wright approached B.W.'s care in a manner that promoted "a return of the child's behavioral and emotional levels to a standard of normalcy as experienced prior to the vaccine injury." *Id.* Thus, he did not agree that Ms. Wright's emotional perceptions surrounding her child's injury likely affected B.W.'s psychological state. *Id.*

2.  Respondent's Expert – Dr. Judith Miller, Ph.D.

Dr. Judith Miller, a clinical psychologist, provided a single expert report on behalf of Respondent. Respondent Psychological Evaluation, filed as Ex. A on May 29, 2018 (ECF No. 50-1) ("Miller Rep."). Her report was based on her review of the medical records filed in this matter, as well as Dr. Jordan's evaluation report, but she did not interview B.W. *Id.* at 1. Dr. Miller concluded that B.W. never suffered from Separation Anxiety Disorder or severe emotional distress as a result of his ITP diagnosis, monitoring, and treatment. *Id.* at 5, 8.

Dr. Miller received her bachelor's, master's, and Ph.D. in clinical psychology from the University of Utah. Dr. Judith Miller Curriculum Vitae, filed as Ex. C on May 29, 2018 (ECF No. 50-3) ("Miller CV") at 1. She also completed a fellowship at the University of Utah Medical School's Neurobehavior Clinic in addition to a postdoctoral fellowship at the Emory School of Medicine's Autism Resource Center. *Id.* She has served as a professor in the field of psychology since 2002, and she is currently and associate professor of psychology in psychiatry at the University of Pennsylvania Perelman School of Medicine. *Id.* She also holds several positions at the Children's Hospital of Philadelphia Center for Autism Research. *Id.* Dr. Miller has published numerous journal articles, the majority of which focus on autism. *Id.* at 16–28. Though her primary area of expertise is autism, Dr. Miller explained that she is familiar with differential diagnoses such as Separation Anxiety Disorder and ADHD because they are often considered when evaluating children for autism spectrum disorder. Miller Rep. at 1.

Dr. Miller first described B.W.'s pre-vaccination condition, noting that B.W. spent much of this time period living with his mother and two siblings in a homeless shelter. Miller Rep. at 2. The records also indicated that B.W. was regularly seen by a pediatrician for routine health screenings and sick visits. Ex. 2–6, 9. During these visits, he was regularly screened for developmental problems. Ex. 2 at 177–78; Ex. 6 at 8. B.W. was consistently found to be developing normally and no behavioral concerns were documented. Miller Rep. at 2; *see also* Ex. 2 at 41–42, 58–59.

Next, Dr. Miller described the events immediately preceding B.W.'s ITP diagnosis. Miller Rep. at 2. Around the time of the April 2014 hospital visits, when B.W.'s bruising first manifested, a child abuse investigation was conducted but was closed within three and a half hours, and B.W. was discharged into his mother's care the next day without further investigation or separation. *Id.* at 2, 4; *see also* Ex. 2 at 72–75; Ex. 4 at 76. Ms. Wright was thereafter attentive towards her son and his medical condition, continuing to monitor B.W.'s symptoms, request testing, and accompanying him to follow-up and sick visits with his pediatrician and specialists following his ITP diagnosis. Miller Rep, at 3–5. The records from these visits established that Petitioner consistently described B.W.'s behavior as active and playful, and she did not express any concerns regarding his behavioral or social development. *Id.*

Developmental screenings performed after B.W.'s ITP diagnosis also showed that B.W. was developing normally. Miller Rep. at 4–5; *see also* Ex. 2 at 177 (describing results for B.W.'s thirty-month developmental screening results as passing). Dr. Miller notes that these findings are consistent with the observations of B.W.'s treating physicians, who noted B.W. appeared to be happy, active, and cheerful. Miller Rep. at 4–5; *see also* Ex. 2 at 90, 111, 142, 153; Ex. 5 at 22–23, 26; Ex. 6 at 2, 5, 8.

Dr. Miller next addressed the applicability of Dr. Jordan's Separation Anxiety Disorder diagnosis. Miller Rep. at 5–8. She explained that Separation Anxiety Disorder is characterized by "excessive worries and thoughts about harm coming to a caregiver (or to oneself) that would lead to prolonged or permanent separation." *Id.* at 6. Such a diagnosis is proper only if the individual in question is mentally capable of understanding that injury or death can lead to prolonged separation. *Id.* At two years old, however, children are incapable of understanding the implications of prolonged separation. *Id.* They do, however, exhibit behaviors consistent with separation anxiety, and such behaviors are considered developmentally normal in young children. *Id.*

Dr. Miller did not find any evidence in the record to support a diagnosis of Separation Anxiety Disorder for B.W. While Ms. Wright reported to Dr. Jordan a change in B.W.'s behavior following his initial hospitalization for ITP, none of the contemporaneous medical records corroborate these recollections, and they were in fact contrary to the positive image of B.W.'s mental health that the record did establish. Miller Rep. at 6–7.; *see also* Ex. 2 at 90, 111, 142, 153; Ex. 5 at 22–23, 26; Ex. 6 at 2, 5, 8. Moreover, Dr. Miller observed several instances where Ms. Wright told B.W.'s physicians that she did not have any behavioral concerns and B.W. was socializing well with other children and attending school. Miller Rep. at 5; *see also* Ex. 2 at 177–78; Ex. 6 at 21; Ex. 9 at 12).[12]

Dr. Miller also challenged Dr. Jordan's opinion that B.W. continues to exhibit some symptoms of Separation Anxiety Disorder. Miller Rep. at 7. Rather, Dr. Miller considered B.W.'s sadness and concern as natural reactions to B.W.'s unstable home life. *Id.* B.W. spent the majority of his early childhood living in a homeless shelter. *Id.* at 7–8. While living in a trailer with his mother and siblings, he did not have access to running water and was ultimately removed from the home and placed in the foster care system as a result of these conditions. *Id.* Such circumstances are not conducive to a wholly-positive mental disposition, and Dr. Miller did not find B.W.'s emotional reaction to those conditions excessive. *Id.* Rather, his sadness and concerns for the future demonstrate nothing more than situational awareness appropriate for his age. *Id.*

## IV.    Briefing on Damages

As discussed earlier, Petitioner requests $100,000.00 in past pain and suffering and $4,345.55 in satisfaction of a Medicaid lien. Pet. Damages Brief at 4. Respondent posits that Petitioner is entitled to an award between $5,000.00 and $10,000.00 for actual pain and suffering,

---

[12] In addition, blood draws that were performed to diagnose and monitor B.W.'s ITP were easily completed and the only comfort measure required was distraction. Miller Rep. at 5; *see also* Ex. 3 at 6 (documenting blood draw absent any notes of distress); Ex. 4 at 21 (documenting a finger-stick blood draw that was completed in a single attempt), 69, 80, 82; Ex. 9 at 52.

but concedes her entitlement to a lump sum payment of $4,245.55 in satisfaction of the Medicaid lien. Respondent's Brief, filed Apr. 7, 2020 (ECF No. 71) ("Resp. Damages Brief") at 14.[13]

A. *Petitioner's Post-Hearing Brief*

Though initially filed in opposition to Respondent's Motion to Dismiss, Petitioner's second Post-Hearing Brief offers several arguments that are also relevant to the issue of damages. Petitioner's Post-Hearing Brief, filed Nov. 30, 2018 (ECF No. 52) ("Pet. Post-Hr'g Brief"). Specifically, Petitioner therein discussed Dr. Jordan's credentials and psychological evaluation of B.W.—both of which are critical in determining an appropriate award of damages—at length. *Id.* at 13–17.

Petitioner first notes that Dr. Jordan has over forty years of experience and has evaluated over 8,000 children and adolescents throughout his career as a licensed psychologist. Pet. Post-Hr'g Brief at 13. She also emphasizes that Dr. Jordan's evaluation was comprehensive, including extensive review of B.W.'s medical records and case filings; interviews with Ms. Wright, B.W.'s foster parent, and B.W.'s teacher; and his own personal observations of B.W. *Id.* at 13–14. Ultimately, this evaluation led Dr. Jordan to conclude that B.W. suffered from Separation Anxiety Disorder, and his separation from Ms. Wright during the child abuse investigation likely contributed to his psychological condition. *Id.* at 14. By contrast, Dr. Miller relied solely on the medical records and Dr. Jordan's opinion. *Id.* And Dr. Miller's primary focus is in the area of autism—a disorder B.W. does not have. *Id.* at 15. Thus, Petitioner argues, Dr. Jordan's broader approach and experience as a school psychologist renders his opinion more reliable overall. *Id.*

Petitioner next argues that although the medical records are inconsistent on the subject, Dr. Jordan's diagnosis of Separation Anxiety Disorder still had preponderant support. Pet. Post-Hr'g Brief at 15–16. Thus, the records document brief encounters that do not fully capture the range of behaviors B.W. was exhibiting following his ITP diagnosis. *Id.* at 16. But by incorporating medical record documentation, Dr. Jordan's evaluation, and Ms. Wright's own observations, an overall accurate and comprehensive understanding of B.W.'s psychological condition following his ITP diagnosis can be ascertained. *Id.* at 15–17.

---

[13] The Act does not allow petitioners to recover compensation "for any item or service to the extent that payment has been made . . . under any Federal or state health benefits program . . . ." Section 15(g). This means that where claimants have received prior treatment for their vaccine injury under a Federal program like Medicaid, a lien arises against any Vaccine Program award for the value of that medical service. *See, e.g.*, *Simmons v. Sec'y of Health & Hum. Servs.*, No. 11-216V, 2019 WL 2572256 (Fed. Cl. Spec. Mstr. May 28, 2019). Petitioner calculates a Medicaid lien exists against her award in the sum of $4,345.55. Pet. Damages Brief at 12; Medicaid Lien, filed as Ex. 16 on Feb. 21, 2020 (ECF No. 69-1). Petitioner has offered substantiating documentation in support of the lien, and no objection has been made regarding this portion of Petitioner's request.

B. *Petitioner's Brief on Damages*

Petitioner's claim is premised on her allegation that between April 2014 and September 2016, B.W. suffered physical and emotional trauma, including Separation Anxiety Disorder, as a result of undergoing fifteen blood draws from April 15, 2014 to April 13, 2016. Pet. Damages Brief, at 9–10; *see also* Ex. 3 at 5–6 (documenting the first of B.W.'s blood draws); Ex. 9 at 14–16 (documenting the last of B.W.'s blood draws). She emphasizes that these blood draws would not have been necessary but for B.W.'s ITP diagnosis, and she supports this contention with the testimony of Dr. Catherine Shaer—an expert in pediatrics. Pet. Damages Brief at 10; Tr. at 19–21. She also alleges that B.W. was acutely aware of his condition. Pet. Damages Brief at 9. She claims that B.W. developed a fear of needles and would shake and cry so much during blood draws that he had to be restrained before a successful draw could be completed. *Id.* And she maintains that B.W. experienced behavioral changes consistent with Separation Anxiety Disorder as a result of his diagnosis and follow-up care. *Id.* at 10. Thus, Petitioner argues that B.W. not only understood the nature of his condition, but also experienced severe physical and emotional anguish over a two-year-and-five-month period as a result. *Id.* at 9–10.

Petitioner was not able to reference comparable reasoned decisions relating to the best calculation of pain and suffering in ITP cases, but notes that many Program cases alleging ITP are resolved through settlement. Pet. Damages Brief at 6. In her Brief, Petitioner provides a list of such cases, for which the average settlement award totals more than the requested amount of $100,000.00 (although these amounts are not broken down by damages sub-categories). *Id.* at 6–7. She also argues that Table-injuries, such as that suffered by B.W., tend to settle for larger amounts than Non-Table claims, and the amounts for which these cases have settled has been steadily increasing year after year. *Id.* at 7.

C. *Respondent's Post-Hearing Brief*

Regarding Petitioner's claim of psychological distress and Separation Anxiety Disorder, Respondent noted in his second Post-Hearing Brief (which was filed as his "Brief in Support of Dismissal") that Dr. Jordan's opinions are overly reliant on the history reported by Ms. Wright—years after the events in question and after this case was filed. Respondent's Brief in Support of Dismissal at 3, 6–7, filed Sept. 28, 2018 (ECF No. 51) ("Resp. Post-Hr'g Brief"). Respondent further argues that the contemporaneous medical records—which are devoid of any behavioral, psychological, or developmental concerns and often describe B.W. as "happy" and developmentally normal—should be given more weight, with the opinions formed based on those records (like those of Dr. Miller) deemed more reliable. *Id.* at 6–11. That record does not support the conclusion that B.W. experienced any form of psychological trauma as a result of his ITP diagnosis.

In support of his position, Respondent references the opinions of Dr. Miller. Resp. Post-Hr'g Brief at 7–11. Respondent emphasizes Dr. Miller's credentials as a licensed clinical psychologist with over twenty-five years of experience diagnosing children with autism spectrum, anxiety, and attention disorder. *Id.* at 7. Respondent also takes note of the circumstances under which Dr. Jordan performed his evaluation of B.W., observing that B.W. (who was almost six years old when he met with Dr. Jordan) was living with a foster parent during that time period. *Id.* at 11. Though Petitioner's experts facially acknowledge the tumultuous circumstances in which B.W. has been raised, Respondent argues that it is these external sources of uncertainty and instability that are most likely responsible for B.W.'s current state of mind, rather than psychological trauma associated in any way with the impact of the MMR vaccine on his life. *Id.*

D.  *Respondent's Specific Brief on Damages*

Though Respondent does not dispute B.W.'s ITP diagnosis, he notes several inconsistencies between Petitioner's allegations regarding the severity of the injury and B.W.'s awareness of the situation and the medical record. First, Respondent observes that the contemporaneous medical records regarding B.W.'s blood draws do not corroborate the fear and violent reactions B.W. is alleged to have displayed. Resp. Damages Brief at 10. The only support for these allegations arises from discussions between Petitioner and Petitioner's counsel. *Id.* (citing Pet. Damages Brief at 9 n.2). Respondent also notes that Petitioner herself has never provided an affidavit in this matter, and thus the record is devoid of any substantiating direct witness evidence about B.W.'s purported condition. Resp. Damages Brief at 10–11.

Second, Respondent maintains that B.W.'s overall injury was mild, making a pain and suffering award of the magnitude sought by Petitioner inappropriate. Resp. Damages Brief at 13–14. To this end, Respondent emphasizes that B.W.'s physicians described B.W.'s condition as "not severe." *Id.* at 13 (citing Ex. 2 at 124). In addition, B.W. was hospitalized only once between April 2014 and September 2016, and it was for a period of less than twenty-four hours. Resp. Damages Brief at 13–14. Additionally, B.W. never required oral, intravenous, or injectable medication to treat his condition. *Id.* at 13. The only medical intervention performed as a result of B.W.'s ITP was regular platelet checks, which occurred approximately fifteen times over the course of two years and five months. *Id.* at 14.

E.  *Petitioner's Reply Brief on Damages*

In her Reply, Petitioner argues that Respondent's proposed award of $10,000.00 does not adequately account for the duration and severity of B.W.'s condition. Petitioner's Reply Brief, filed May 28, 2020 (ECF No. 73) ("Reply") at 3, 5–6, 9. She emphasizes that B.W required almost two and one-half years of monitoring for his condition. Reply at 5. Petitioner also argues that the

testimony of Drs. Shaer and Jordan provides ample evidence of the physical and emotional trauma B.W. sustained in connection with his ITP diagnosis. *Id.* at 8–9. Thus, Petitioner maintains that $100,000.000 is a proper pain and suffering award. *Id.* at 9.

## V.    Applicable Law

### A.    *Standard of Law for Table Claims*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table— corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006). In this case, Petitioner asserts a Table claim.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

Table claim petitioners need not independently demonstrate that the vaccine at issue *can cause* the claimed injury, nor that the vaccine did cause the injury in that case. *Shalala v. Whitecotton*, 514 U.S. 268, 270 (1995). Instead, so long as the claimed injury occurred in accordance with the Table's injury definitions and onset timeframe, causation is presumed. *Id.* This presumption of causation does not excuse Table claim petitioners from other statutory requirements for compensation, however. *Song v. Sec'y of Health & Hum. Servs.*, 31 Fed. Cl. 61, 65 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994) (unpublished table decision); *Crabbe v. Sec'y of Health & Hum. Servs.*, No. 10-762V, 2011 WL 4436724, at *1 (Fed. Cl. Spec. Mstr. Aug. 26, 2011). Thus, Table or not, Vaccine Program claimants not asserting a vaccine-related death or

other injury requiring a surgical intervention and inpatient care must demonstrate that they suffered the residual effects or complications from their vaccine-related injury for more than six months. Section 11(c)(1)(D).

## B.    *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd sub nom. Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion). This presumption is based on the linked propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony—especially

where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Dep't of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

There are, however, situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("'[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent'") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *Lalonde v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C.    *Analysis of Expert Testimony*

Establishing an appropriate damages award often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). "The *Daubert* factors for analyzing the reliability of testimony are: (1) whether a theory or

technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

The *Daubert* factors play a slightly different role in Vaccine Program cases than they do when applied in other federal judicial fora (such as the district courts). *Daubert* factors are usually employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable and/or could confuse a jury. In Vaccine Program cases, by contrast, these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 742–45 (2009). In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts…." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08-601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for rev. denied*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. Appx. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1325–26 (Fed. Cir. 2010) ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

Expert opinions based on unsupported facts may be given relatively little weight. *See Dobrydnev v. Sec'y of Health & Hum. Servs.*, 556 F. Appx. 976, 992–93 (Fed. Cir. 2014) ("[a]

doctor's conclusion is only as good as the facts upon which it is based") (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("[w]hen an expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion")). Expert opinions that fail to address or are at odds with contemporaneous medical records may therefore be less persuasive than those which correspond to such records. *See Gerami v. Sec'y of Health & Hum. Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013), *aff'd*, 127 Fed. Cl. 299 (2014).

> D. *Consideration of Medical Literature*

Both parties filed medical and scientific literature in this case, but not every filed item factors into the outcome of this decision. While I have reviewed all the medical literature submitted in this case, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. Appx. 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

> E. *Consideration of Comparable Special Master Decisions*

In reaching a decision in this case, I have considered other decisions issued by special masters (including my own) involving similar injuries, vaccines, or circumstances. I also reference some of those cases in this Decision, in an effort to establish common themes, as well as demonstrate how prior determinations impact my thinking on the present case.

There is no error in doing so. It is certainly correct that prior decision in different cases do not *control* the outcome herein.[14] *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1358–59 (Fed. Cir. 2019); *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). Thus, the fact that another special master reasonably determined elsewhere, on the basis of facts not in evidence in this case, that preponderant evidence supported the conclusion that petitioner's injury X was entitled to an award of Y does not compel me to reach the same conclusion in *this* case. Different actions present different background medical histories, different experts, and different items of medical literature, and therefore can reasonably result in contrary determinations.

---

[14] By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. Appx. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014). Special masters are also bound within a specific case by determinations made by judges of the Court of Federal Claims after a motion for review is resolved, as is the case here.

However, it is *equally* the case that special masters reasonably draw upon their experience in resolving Vaccine Act claims. *Doe v. Sec'y of Health & Hum. Servs.,* 76 Fed. Cl. 328, 338–39 (2007) ("[o]ne reason that proceedings are more expeditious in the hands of special masters is that the special masters have the *expertise and experience to know the type of information that is most probative of a claim*") (emphasis added). They would therefore be remiss in ignoring prior cases presenting similar theories or factual circumstances, along with the reasoning employed in reaching such decisions. This is especially so given that special masters not only routinely hear from the same experts in comparable cases but are also repeatedly offered the *same* items of medical literature. It defies reason and logic to obligate special masters to "reinvent the wheel", so to speak, in each new case before them, paying no heed at all to how their colleagues past and present have addressed similar causation injuries or fact patterns. It is for this reason that prior decisions can have high persuasive value—and why special masters often explain how a new determination relates to such past decisions. Even if the Federal Circuit does not *require* special masters to distinguish other relevant cases (*Boatmon,* 941 F.3d at 1358), it is still *wise* to do so.

F.     *Pain and Suffering Determinations*

The sole damages issue before me is the amount of pain and suffering to be awarded in this case, since both sides agree *some* amount is appropriate. There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").

Many Vaccine Program cases discuss calculation of two subcategories of pain and suffering awards—past (or "actual") and projected—and then add them together, to come up with the total sum (with the future component discounted to net present value). *See, e.g.*, *Collado v. Sec'y of Health & Hum. Services*, No. 17-0225V, 2018 WL 3433352, at *6–8 (Fed. Cl. Spec. Mstr. June 6, 2018). Here, I do not find the total sum to be awarded needs to be so separately calculated. Petitioner has not requested a bifurcated award, based on prior suffering plus anticipated future experience—and more importantly, Petitioner *has not established* entitlement to a future award, given that his single, vaccine-caused ITP occurrence has not been shown to have resulted in life-long sequelae or likely future emotional harm. Thus, an award for actual/past pain and suffering is all that is warranted in this case.

The Vaccine Act caps the awardable amount of total pain and suffering damages at $250,000.00. Section 15(a)(4). A persuasive Court of Federal Claims decision issued within the last seven years suggests that special masters should calculate the *total* pain and suffering award

appropriate (whatever it is) before applying the cap, rather than treating the $250,000.00 amount as the top of a "range" of potential awards, with cases falling within a spectrum based on comparable severity. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579, 589–90 (2013). Special masters have accepted *Graves*'s methodology since the case's issuance. *See, e.g.*, *Bruegging v. Sec'y of Health & Hum. Servs.*, No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019); *Reed v. Sec'y of Health & Hum. Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019).

Although a persuasive argument can be made that the passage of time has rendered the cap an artificial limitation on total recoverable pain and suffering, it still reflects Congress's judgment that there should be an outer bound for pain and suffering awards—and implicit to that is the reasonable likelihood that many cases will warrant some lower figure. Nevertheless, I have in prior cases followed *Graves*, and I will apply it herein as well—although I do so mindful of the need to consider the overall strength of Petitioner's showing herein.

In calculating pain and suffering awards, Court of Federal Claims judges and special masters have frequently considered three primary factors: (a) severity of the injury, (b) awareness of the injury, and (c) duration of the suffering. *Collado,* 2018 WL 343352, at *6. Awareness is often deemed a function of whether the injured party was mentally competent (*see, e.g.*, *Meyers v. Sec'y of Health & Hum. Servs.*, No. 18-0909V, 2020 WL 3755335, at *3 (Fed. Cl. Spec. Mstr. June 5, 2020)). When considering this aspect of a petitioner's experience, the question is whether there were any impediments that may have prevented petitioner from perceiving their injury. *See Cates v. Sec'y of Health & Hum. Servs.*, No. 18-277V, 2020 WL 3751072, at *2 (Fed. Cl. Spec. Mstr. June 5, 2020) (noting that the petitioner was a competent adult and did not suffer from any impairments that would have diminished her awareness of her injuries). Thus, when an infant or young child is injured, it is reasonable to consider whether the child's age and limited cognitive abilities would have impaired their awareness of the injury.

Duration and severity, by contrast, relate to the amount of pain or loss of normal function imposed by the injury, and the length and invasiveness of treatments required for it. As a number of decisions on the subject reached in cases involving shoulder injuries related to vaccine administration reveal, the amount to be awarded should take into account not only how painful (both in terms of immediacy and duration) the injury has proven, but the degree of treatment it required—measured in terms of things like whether surgical intervention was needed (and if so, how invasive it was), and how many treater visits were necessary. *See, e.g.*, *Smallwood v. Sec'y of Health & Hum. Servs.*, No. 18-029V, 2020 WL 2954958 (Fed. Cl. Spec. Mstr. Apr. 29, 2020).

Emotional distress can be considered within the foregoing framework, but also as a distinct pain and suffering component. Emotional distress need not arise from the physical pain associated with the alleged injury to justify a pain and suffering award. *Youngblood v. Sec'y of Dep't of Health & Hum. Servs.*, No. 91-1442V, 1993 WL 22177, at *2–3 (Fed. Cl. Spec. Mstr. Jan. 13, 1993),

(finding that emotional distress is an appropriate factor to be considered when calculating an award for pain and suffering) *rev'd on other grounds*, 32 F.3d 552 (Fed. Cir. 1994). In some cases, evaluation of emotional distress may require a separate inquiry, distinct from that related to the experience of physical pain. *Youngblood,* 1993 WL 22177, at *2 (concluding that "[i]t is reasonable to assume that §15(a)(4) of the statute contemplates emotional distress as being related to something *other than* physical pain and suffering because it allows compensation for both." (emphasis added)). Nevertheless, reasoned special master analyses accounting for emotional distress are rare, and considerations of emotional injury are usually subsumed under the broader category of "pain and suffering." *See, e.g.*, *Carlson v. Sec'y of Health & Hum. Servs.*, No. 14-82V, 2015 WL 6684866, at *1 (Fed. Cl. Spec. Mstr. Oct. 7, 2015) (adopting a stipulation awarding a lump sum of $20,000.00 to a petitioner who alleged (among other things) psychologic injury as a result of the flu vaccine, but failing to outline what portion of the award was related to the psychological component of the claim).

Special masters have found that loss of enjoyment of life, anguish, disappointment, and frustration as an injured child realizes he is different from his peers, and/or is unable to engage in the same activities as other children his age, exemplify compensable emotional distress under Section 15(a)(4). *See Youngblood*, 1993 WL 22177, at *2–3; *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-092V, 1996 WL 147722, at *22 (Fed. Cl. Spec. Mstr. Mar. 18, 1996) (citing *McGhee v. Sec'y of Dep't of Health & Hum. Servs.*, No. 92-332V, 1993 WL 371000, at *7 (Fed. Cl. Spec. Mstr. Sept. 8, 1993)). As with any damages issue, however, it remains a petitioner's burden to provide preponderant evidence of emotional distress. *See Brewer*, 1996 WL 147722, at *22.

## ANALYSIS

### I.   Petitioner Has Established a Viable Table Claim

In this matter, Petitioner alleges that her son developed ITP eighteen days after he received the MMR vaccine. Pet. at 1–2. ITP following receipt of the MMR vaccine is a recognized Table injury, and causation may be presumed if onset occurred between 7-30 days post-vaccination. 42 C.F.R. §100.3(a)(V)(A), (c)(7). In his supplemental Rule 4(c) Report, Respondent indicated that he "does not dispute that B.W. meets the requirements of a Table ITP injury following MMR vaccine." Supplemental Rule 4(c) Report, filed Nov. 8, 2019 (ECF No. 63). And although Respondent initially challenged Petitioner's claim based on the severity of the injury, arguing that B.W.'s condition or sequelae related to the injury persisted for the statutorily required period of six months (Respondent's Pre-Hearing Brief, filed Sept. 8, 2017 (ECF No. 33) at 6–7), the Court of Federal Claims has determined that severity is established based upon the record of post-onset platelet count testing. Reported Opinion, filed July 16, 2019 (ECF No. 60).

In light of the above and based upon my own careful consideration of the record as well as the Court's finding on the severity issue, I determine that Petitioner has preponderantly satisfied all Table and statutory requirements and has therefore established entitlement to compensation.


## II.  Calculation of Pain and Suffering Award in this case

### A.  *Prior Decisions and Awards*

As both Petitioner and Respondent acknowledged in their respective briefs, virtually all damages decisions involving ITP as a vaccine injury have been the result of stipulation or proffers, leaving few reasoned decisions addressing what amount of pain and suffering is appropriate for this kind of injury, which presents insidiously and does not often produce lasting or harmful sequelae. Thus, although previously-settled ITP injury cases provide some insight into the proper magnitude of award herein, they are less valuable guidance than a reasoned decision would be.

What is evident from the existing body of relevant case law is that damages awards for ITP vary dramatically. *See Fantell v. Sec'y of Health & Hum. Servs.,* No. 17-892V, 2019 WL 2713139 (Fed. Cl. Spec. Mstr. June 3, 2019) (stipulation awarding a minor child $75,000 for ITP following receipt of several vaccinations)*; DeWeese v. Sec'y of Dep't of Health & Hum. Servs.*, No. 09-469V, 2011 WL 5056993 (Fed. Cl. Spec. Mstr. Sept. 22, 2011) (stipulation awarding $100,000 for ITP following receipt of several vaccinations); *Braveman v. Sec'y of Health & Hum. Servs.*, No. 08-137V, 2008 WL 4684336 (Fed. Cl. Spec. Mstr. Oct. 6, 2008) (stipulation awarding minor child a lump sum of $15,000 for damages related to ITP following receipt of the MMR vaccine); *Ball v. Sec'y of Dep't of Health & Hum. Servs.*, No. 99-424V, 2008 WL 2337854 (Fed. Cl. Spec. Mstr. May 16, 2008) (stipulation awarding $230,000 for ITP following MMR and Hepatitis B vaccination); *Cost v. Sec'y of Health & Hum. Servs.*, No. 07-234V, 2008 WL 1989095 (Fed. Cl. Spec. Mstr. Apr. 16, 2008) (stipulation awarding a minor child a lump sum of $15,000 for damages related to ITP following receipt of the MMR vaccine). Such a wide range of awards suggest that ultimately the individual facts of a given case are paramount.

### B.  *A Modest Pain and Suffering Award is Appropriate in This Case*

Here, considering the record and applying the "severity-duration-awareness" factors that go into calculation of a pain and suffering award, I determine that an award more modest than what Petitioner requests is most appropriate.

1.      Severity of Injury (Physical or Emotional)

B.W.'s ITP was overall quite mild, featuring little in the way of medical intervention other than initial treatment and several subsequent blood draws required to ascertain platelet levels. Though there are numerous instances throughout the record in which B.W. was *initially* observed to have bruising, there is no indication that these bruises caused him any pain or distress, or that they recurred on a regular basis thereafter. *See* Ex. 3 at 3 (noting that "pt does not appear to be in pain" and that nothing exacerbated his pain); *id.* at 6 (noting that B.W. "denie[d] meds/discomfort [at] this time"); Ex. 2 at 92 (documenting minor bruising, but no mention of pain); *id.* at 107 (documenting "few scattered bruises…not concerning" and no notes regarding pain); *id.* at 140 (complaints of a headache but no trauma to head or face is noted—the only documented bruising is on B.W.'s shins); Ex. 4 at 76 (noting that B.W.'s bruise was not tender during palpitation). Additionally, his bruising was often characterized as "minor" and non-concerning. Ex. 2 at 92, 107, 127 (noting that B.W.'s ITP was "not severe" and "tends to be more mild and associated with self resolution"). And there are several visits in which no bruising is noted. Ex. 2 at 144, 159, 163, 168, 178; Ex. 8 at 3; Ex. 9 at 2–3.

At worst, B.W. underwent repeated blood draws to test for platelet amounts. While there is no question that blood draws can be unpleasant, they are generally not considered to be an overly invasive or physically traumatic procedure, and Petitioner has pointed to no Program decisions in which testing procedures required for post-onset condition monitoring were found to support a high pain and suffering award (even though this same evidence was determined to be sufficient to establish the claim's six-months severity—a different consideration, as discussed below). Petitioner also has not established how the majority of B.W.'s blood draws were performed (i.e., via finger stick or venous puncture) such that it could be determined that such post-onset monitoring was exceptionally painful or physically traumatic.[15] And there is no evidence that B.W. experienced severe pain during these instances, or that he required more than a parent's presence to comfort him. *See* Ex. 4 at 65–69, 71, 73 (documenting B.W.'s pain level as "0" at all times during his admission and noting that the only comfort measures provided were from the parent); Ex. 2 at 90 (describing B.W. as active and playful during his appointment on May 2, 2014); Ex. 6 at 2 (noting that B.W. "smiles, [is] playful, and active and alert" without distress). There is similarly no evidence to suggest that B.W. suffered from any physical complications as a result of having his blood drawn.

---

[15] Dr. Shaer was unaware of how these blood draws were performed—either by venipuncture or a much less invasive finger stick. Tr. at 37. From the medical record, it is known that the second blood draw performed on B.W. on April 16, 2014, was a venous puncture and required several tubes of blood to be drawn. Ex. 4 at 80–81. Then, the blood draw performed on May 13, 2014 was completed with a simple finger stick. Ex. 4 at 21. Records documenting the other thirteen blood draws B.W. underwent do not indicate which method was used.

In addition to physical severity, Petitioner also alleges that he experienced severe psychological trauma as a direct result of his ITP diagnosis and treatment. Pet. Damages Brief at 9–10. The blood draws allegedly provoked a violent, fearful reaction in B.W., later contributing to his development of Separation Anxiety Disorder. Jordan Rep. at 2. But the record and expert evidence does not support this contention whatsoever.

Petitioner largely relies on the psychological evaluation performed by Dr. Jordan, and to a lesser degree, the hearing testimony of Dr. Shaer. But both experts themselves relied heavily on hearsay information provided by Ms. Wright (who never offered a written witness statement in this case). Jordan Rep. at 2–3 (noting that "Separation anxiety lasted *according to the mother's description* of symptoms approximately 6 months." (emphasis added)); Tr. at 31–32, 66 (noting Dr. Shaer's opinion that there was no evidence of psychological trauma outside of the conversation she had with Ms. Wright). Indeed, Dr. Jordan relied exclusively on the information provided by Ms. Wright in making his diagnosis of Separation Anxiety Disorder (which he admitted was no longer a supportable diagnosis as of 2018, given additional information obtained from B.W.'s foster parents and treaters). Jordan Rep. at 2–3, 6–7.

In addition, nearly all of Dr. Jordan's conclusions about B.W.'s mental state after manifestation of his ITP are directly contradicted by the contemporaneous medical records. For example, while Dr. Jordan opines that B.W. began to exhibit violent behaviors such as kicking, biting, slapping, and screaming shortly after his ITP diagnosis, medical records documenting B.W.'s behavior during the relevant time period describe B.W. as active and playful, and those records do not establish that Petitioner ever expressed any concerns regarding B.W.'s behavioral or social development. Ex. 2 at 90, 111, 142, 153; Ex. 5 at 22–23, 26; Ex. 6 at 2, 5, 8. Developmental screenings that were performed after B.W.'s ITP diagnosis showed that B.W. was developing normally. Ex. 2 at 177 (describing results for B.W.'s thirty-month developmental screening results as passing). During these treatment visits, Petitioner herself indicated that she did not have any concerns regarding B.W.'s behavior, and he was reported to be socializing well with others. *See* Ex. 2 at 177–78; Ex. 6 at 21; Ex. 9 at 12.[16] Where the medical records note a happy, pleasant, well-socialized child, Dr. Jordan describes a fearful, violent, ill-adjusted boy. *Compare* Ex. 2 at 90, 111, 142, 153; Ex. 5 at 22–23, 26; Ex. 6 at 2, 5, 8 *with* Jordan Rep. at 2–4.

The medical records filed in this matter appear to be complete and accurate, and neither party has persuasively discredited their reliability. They are therefore entitled to substantial weight. *Lowrie*, 2005 WL 6117475, at *20. Conversely, expert opinions (such as Dr. Jordan's) that fail to

---

[16] Dr. Jordan also indicated that B.W.'s violent behavior and separation anxiety symptoms required his mother to remove him from daycare and made arranging for childcare especially difficult. Jordan Rep. at 2. The medical records indicate, however, that B.W. was not in daycare prior to his March 2014 vaccination, and he did not start attending daycare until after his ITP diagnosis. *See* Ex. 2 at 15, 26, 30, 40, 46, 57 (noting that B.W. was not in daycare between June 16, 2013 and March 16, 2013), 58 (indicating B.W. has childcare), 124, 177 (noting that B.W. is attending daycare on May 13, 2014 and December 23, 2014).

address or are at odds with contemporaneous medical records are generally deemed less persuasive. *See Gerami*, 2013 WL 5998109, at *4; *Cucuras*, 993 F.2d at 1528; *see also* Murphy, 23 Cl. Ct. at 733 (citing *United States Gypsum Co.*, 333 U.S. at 396 ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")). And I am not required to accept the conclusions of an expert based only on the *ipse dixit* of that expert, especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co*, 522 U.S. at 146); *see also Isaac*, 2012 WL 3609993, at *17 (citing *Cedillo*, 617 F.3d at 1339). Indeed, expert opinions rooted in incorrect facts may be rejected for that reason alone. *Dobrydnev*, 556 F. Appx. at 992–93. Petitioner has provided no persuasive explanation for the stark contrast between the contemporaneously-documented medical records and the hearsay reports subsequently provided by Petitioner following commencement of litigation.

I also find that Dr. Miller's points about the weaknesses of Dr. Jordan's opinion compelling—even in the face of the fact that Dr. Miller herself never interviewed B.W. Although Dr. Jordan did conduct an extensive psychological evaluation of B.W., including an interview with B.W., and his mother, several interviews with B.W.'s foster parent and teachers, and the administration of intellectual and educational assessments, none but his interview with Ms. Wright were cited as influential in forming his diagnosis of Separation Anxiety Disorder. Jordan Rep. at 1–3. The relevancy of the other interviews and assessments appear limited to ADHD, which Dr. Jordan does not ascribe to B.W.'s vaccination. *Id.* at 4–9. Dr. Miller's assessment was more record-based, and she persuasively demonstrated the absence of proof that B.W. had been scarred psychologically by his ITP.

There is otherwise no persuasive evidentiary grounds in this case to find that B.W.'s ITP resulted in lasting psychological harm. Dr. Shaer's speculation that B.W. may have experienced vulnerable child syndrome was not only disputed by Petitioner's other expert, Dr. Jordan, but undercut by her own admissions at hearing. Jordan Rep. at 4; Tr. at 39. The record does not suggest B.W. did in fact incur psychologic damage due to his ITP, while it also contains ample evidence of *other* harmful or mentally-painful occurrences relating to the circumstances of his upbringing that Petitioner has not distinguished (let alone addressed).[17] And, as noted above, too much of Petitioner's arguments on this point rely on statements of the Petitioner reported by others, rather

[17] For example, Dr. Shaer expressed substantial concern about the effect Ms. Wright's behavior and anxiety would have had on B.W.'s mental state. Tr. at 32–35. She also noted that Ms. Wright demonstrated ongoing anxiety and fear about B.W.'s condition, and that she appeared to believe her child continued to suffer from ITP, even though he had long been stable at the time of their conversation. *Id.* at 31, 69. The unstable and precarious nature of B.W.'s home life could also have contributed to any alleged emotional distress. Throughout the medical record, it is noted that B.W. was living in a women's shelter with his mother and siblings. Ex. 2 at 15, 26, 30, 40, 46, 57, 85, 91, 99. Eventually, Ms. Wright, along with her children, moved into a trailer without running water. Jordan Rep. at 4. In October 2016, B.W. was removed from his mother's care and placed into a foster home due to the poor living conditions in which he had been found. *Id.* Dr. Miller opined that the sadness and concern Dr. Jordan reported observing in B.W. were more likely related to his recent foster care placement than any injury he suffered four years previously, when he was only a toddler. Miller Rep. at 7–8.

than direct evidence from her—and while I have considered those statements (since the rules of evidence do not prohibit admission of bald hearsay in the Vaccine Program), I reasonably take into account their hearsay character in giving them less weight—especially where, as here, they are outright rebutted by the actual record. *See, e.g.*, *Chinea v. Sec'y of Health & Hum. Servs.*, No. 15-095V, 2019 WL 1873322, at 30 n.40 (Fed. Cl. Spec. Mstr. Mar. 15, 2019) (noting that statements possessing a "hearsay quality" should be afforded less weight).

Accordingly, given the absence of corroborating evidence, I find that Petitioner has not preponderantly established that B.W. suffered from severe emotional distress and psychological injury in the form of Separation Anxiety Disorder as a direct result of his vaccine-induced ITP.

## 2.    Limited Duration of ITP Sequelae

Second, the duration of any suffering experienced by B.W. due to his vaccine-induced ITP was not notably long. Indeed, the medical record indicates that by July 2014—approximately three months after the onset of his ITP—B.W. had normal platelet counts. *See* Ex. 2 at 142–46. Unquestionably B.W. was thereafter monitored for another twenty-one months, during which time he underwent more blood draws. Ex. 2 at 136–41, 151–56; Ex. 9 at 23–25, Ex. 9 at 14–16, 35. But it does not appear that the subsequent monitoring was more than an inconvenience. Indeed, B.W.'s condition does not appear to have been inherently painful even during the three months he actually exhibited low platelet counts. Ex. 3 at 3 (noting that "pt does not appear to be in pain" and that nothing exacerbated his pain); *id.* at 6 (noting that B.W. "denie[d] meds/discomfort [at] this time"); Ex. 2 at 92 (documenting minor bruising, but no mention of pain).

In so finding, I note the distinction between a showing of durational severity sufficient to meet the general requirements for a Program claim, and severity in calculating a pain and suffering award. Six-month severity is largely a *durational* consideration that obligates petitioners to show that they "suffered the residual effects or complications" for their vaccine-caused injury for a sufficient time after vaccine administration to render the claim actionable. Section 11(c)(1)(D)(i); *see also Wyatt v. Sec'y of Health & Hum. Servs.*, No. 14-706V, 2018 WL 7017751, at *22–23 (Fed. Cl. Spec. Mstr. Dec. 17, 2018). This ensures that the Program focuses on significant injuries, rather than transient, vaccine-caused harm that has quickly resolved without lasting deleterious impact. *See, e.g.*, *Watts v. Sec'y of Health & Hum. Servs.*, No. 17-1494V, 2019 WL 4741748, at *7–8 (Fed. Cl. Spec. Mstr. Aug. 13, 2019).

Here, by contrast, severity for pain and suffering purposes is a multi-dimensional consideration that involves more than the durational impact of an injury-causing vaccination. Rather, severity in this context gives weight to degrees of suffering, invasiveness, and the need to bear with pain and the treatment attention that the injury demands. *See, e.g.*, *DeLozier v. Sec'y of Health & Hum. Servs.*, No. 15-124V, slip op. at 5–6 (Fed. Cl. Spec. Mstr. Aug. 11, 2020) (citing *Smallwood*, 2020 WL 2954958), *Mot. for Rev. docketed*, Sept. 10, 2020. That kind of severity is

simply absent from the facts of this case. The length of time it took for medical providers to ensure to their satisfaction that ITP was in fact no longer a concern for B.W. is not alone enough to support a large pain and suffering award.

3.      Awareness

Finally, the "awareness" component does not militate in favor of a high pain and suffering figure. Respondent's psychology expert, Dr. Miller, did raise some concerns regarding B.W.'s cognitive abilities at the onset of his injury. *See* Miller Rep. at 6. But while Dr. Miller explained why a two-year-old child would not necessarily be aware of the prolonged effects of separation from a parent, she did not raise similar concerns regarding that child's ability to understand physical pain and suffering. *Id.* Though B.W. was still quite young when he experienced the onset of his injury, nothing in the record indicates that he was unable to feel and understand the pain associated with the blood draws that were performed as a result of his condition. Thus, while B.W. may not have *fully* appreciated the nature of his injury, it is more likely than not that he was able to understand and appreciate the pain he felt whenever he was required to undergo a blood draw.

Given all of the above, I find a total award of $25,000.00 in pain and suffering is reasonable and fair. ITP is on the mild end of vaccine injuries generally, and the evidence in this case supports the conclusion that B.W.'s ITP resolved fairly quickly, even if monitoring for its recurrence continued for some time. Petitioner has not otherwise established any lasting, credible physical or emotional harm from the ITP. While some award is fair—to compensate for the fear from the injury itself, and in recognition of the limited trauma of the condition's discovery and need for a period of time to watch for its recurrence—nothing comparable to what Petitioner requests is justified, under the facts of this case or in light of relevant precedent. The number I arrive at is also more than twice what Respondent proposes, thus underscoring my determination that more than a nominal amount is justified.

**CONCLUSION**

In light of the above, I calculate damages as follows:

| Damages category | Requested | Awarded | Difference |
|---|---|---|---|
| Pain and Suffering | $100,000.00 | $25,000.00 | $75,000.00 |
| Medicaid Lien | $4,345.55 | $4,345.55 | $0.00 |
| Total | **$104,345.55** | **$29,345.55** | **$75,000.00** |

**As a result, I approve a Vaccine award of $29,345.55, which represents compensation for pain and suffering ($25,000.00) and in satisfaction of a Medicaid lien ($4,345.55) in the form of a check payable to Petitioner.[18]**

This amount represents compensation for all items of damages that would be available under Section 15(a).

In the absence of a timely-filed motion for review (see Appendix B to the Rules of the Court), the Clerk **SHALL ENTER JUDGMENT** in accordance with this decision.[19]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[18] I am aware that the Petitioner has proposed that the payment be made in trust for the benefit of B.W. Reply at 2–3. Petitioner has not, however, provided a mechanism for accomplishing this. Once judgment enters in the case, and after the parties signal their willingness to accede to it, Petitioner may request relief from judgment under Vaccine Rule 36 and propose how any such trust would be structured.

[19] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.